UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In the Matter of: | : Case No. 00-15350 (AJG) |
| RMM RECORDS & VIDEO CORP., | : |
| | : Chapter 11 |
| Debtor, | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x  Adversary No. 06-01351

RMM RECORDS & VIDEO CORP.,                              :
                                                       :
                    Plaintiff,                         :
                                                       :
          -against-                                    :
                                                       :
UNIVERSAL MUSIC AND VIDEO DISTRIBUTION                 :
CORP., now known as UNIVERSAL MUSIC GROUP              :
DISTRIBUTION, CORP.,                                   :
                                                       :
                    Defendant.                         :
                                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


**CAPLAN & ROSS, LLP**
100 Park Avenue
New York, New York  10017
(212) 973-2376

*Counsel for Plaintiff*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

COUNTER-STATEMENT OF FACTS ............................................................................ 2

ARGUMENT ....................................................................................................................... 5

POINT I    NUMEROUS MATERIAL FACTUAL ISSUES PRECLUDE SUMMARY
JUDGMENT IN DEFENDANT'S FAVOR ON THE AUDIT CLAIMS.................... 5

POINT II   DEFENDANT'S TANGENTIAL REQUEST TO DISQUALIFY ANDREW
ADLER AS AN EXPERT WITNESS IS WHOLLY MISPLACED AND
WITHOUT MERIT ................................................................................................ 17

CONCLUSION ................................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..................................................... 5

Baum v. County of Rockland, 337 F. Supp. 2d 454 (S.D.N.Y. 2004)............................................. 9

Gustafson v. Alloyd Co., 513 U.S. 561 (1995)........................................................ 12, 13

Hunt Ltd. v. Lifshultz Fast Freight, Inc., 889 F.2d 1274 (2nd Cir. 1989)....................................... 12

Liebowitz v. Elsevier Science Ltd., 927 F. Supp. 688 (S.D.N.Y. 1996) ........................................ 16

Ocean Partners, LLC. v. North River Insurance Co., 546 F. Supp.2d 101 (S.D.N.Y. 2008) ......... 6

RJE Corp. v. Northville Industries Corp., 329 F.3d 310 (2nd Cir. 2003)....................................... 12

Russell Motor Car Co. v. United States, 261 U.S. 514 (1923) ....................................................... 13

State of Washington v. Leyser 196 Cal. App. 3d 451 (Court of Appeal 1987)............................ 16

Stern v. Trustees of Columbia Univ., 131 F.3d 305 (2d Cir.1997) ................................................ 5

**Statutes**

Fed. R. Civ. 56 ................................................................................................................ 5

## PRELIMINARY STATEMENT

Defendant's Motion for Summary Judgment as to the audit claims of Debtor-Plaintiff

RMM Records & Video Corp. ("RMM" or "Plaintiff") simply ignores numerous issues of

material fact.  Indeed, the motion does not even address numerous audit claims asserted,

including Defendant's admission of the validity of $127,000 of RMM's claim in connection with

Defendant's distribution fee.  Further, as to the remaining disputed portion of the Incorrect

Distribution Fee claim, RMM agrees that there is no factual dispute and has likewise moved for

summary judgment, as the claim concerns the interpretation of a contractual provision under the

parties' distribution agreement.   It is respectfully submitted that the unambiguous contractual

terms entitles RMM, not Defendant, to judgment as a matter of law.

 Defendant's motion is also nearly barren of any supporting law for its self-serving

contentions.  For example, without citation to any authority, Defendant implies that RMM's

alleged failure to object to certain improper accountings by Defendant somehow absolves

Defendant.  But, the law is clear that a failure to object will only act as a waiver of a contract

claim where it is established that the party knew of the claim and actually intended to waive it.

Nowhere in Defendant's papers is there even an allegation that RMM intended to waive any

claim, let alone proof establishing such waiver.

Finally, Defendant's motion includes a misplaced request to disqualify Andrew Adler, a

certified public accountant who performed the fieldwork and prepared the Reports, from

testifying as an expert witness.  Mr. Adler's testimony and findings, however, are largely factual

in nature.  Moreover, to the extent RMM will rely upon Mr. Adler as an expert, his years of

involvement in music industry examinations and the standard procedures employed warrant it.

Accordingly, Defendant's motion should be denied in its entirety.

## COUNTER-STATEMENT OF FACTS

On November 14, 2000, RMM, a pioneering record company in the salsa and Latino music markets, filed for bankruptcy protection following the entry of a multi-million dollar civil judgment against it in the United States District Court for the District of Puerto Rico by a party unrelated to this adversary proceeding.   At the time of that filing, Universal was the long-time distributor of RMM's products. [1]  In order to satisfy that judgment and all of RMM's other creditors, RMM, in a Confirmed Plan of Reorganization, subsequently agreed to transfer all of its assets, which included its immensely valuable catalog of master recordings and artist agreements, to Universal, which would then have the right to exploit and profit from such catalog of recordings and stable of artists for years on end after the closing of the sale.  From the proceeds of that sale, RMM's unsecured creditors were all paid in full.

The purchase agreement between RMM and Universal also provided RMM with certain rights to audit the books and records of Universal, with the obligation on Universal's part to pay RMM any underpayments found due (with respect to prior accountings provided by Defendants to RMM pursuant to the distribution agreements) as a component of the purchase price for RMM's assets.

Pursuant to its rights under the asset purchase agreement, RMM conducted two examinations of Universal's books and records relating to its distribution of RMM product – one of Universal Music and Video Corp. ("UMVD"), and the other of Universal Music Latin America, Inc. ("UMLA"), which acted as Universal's foreign distributor of RMM's products.

---

[1] A copy of the Distribution Agreement dated November 15, 1995 is annexed to the Declaration of Jonathan J. Ross in Support of RMM's Motion for Summary Judgment dated July 7, 2008 as Ex. 3.

These Reports showed significant underpayments of monies owed to RMM.[2]

As an initial matter, Defendant's motion for summary judgment **does not** address or challenge any of the following claims made in the Reports (*see,* Declaration of Andrew Adler submitted contemporaneously herewith ("Adler Dec."), ¶ 4; 2005 Erk Aff., Ex. G & Q):

> On the **Incorrect Distribution Fee Claim** contained in the UMVD Audit, Defendant has acknowledged that $127,398 is due and owing. Defendant's motion here fails to mention that portion of the claim, and solely addresses an additional amount of $76,206 related to co-op advertising credits that Defendant failed to include in its calculation;

> The **Incorrect Cost Claim** of $1,112.00 in the UMVD Audit has been acknowledged by Defendant. This claim is based upon Defendant's improper charging to the account of RMM a cost related to a non-RMM artist. The claim was confirmed by Defendant's production of the supporting third-party invoice, which references a non-RMM artist;

> The **Unsubstantiated Synchronization Income Claim** of $3,378 in the UMLA Audit;

> The **Unmatched Artists' Income Claim** of $3,219 in the UMLA Audit.

> The **Unreported Earnings-BMG Audio and Video** Claim of $232 in the UMLA Audit.

---

[2] Copies of the audit reports have been filed with the Court as Exhibits G and Q, respectively, to the Affidavit of Arthur Erk dated November 2005 and filed on March 15, 2006 ("2005 Erk Aff.") in this adversary proceeding. The 2005 Erk Aff. together with the Affidavit of Michael Lehman, filed contemporaneously therewith, are deemed the Complaint in this Adversary Proceeding per the Stipulation and Order filed on March 9, 2006 in RMM's bankruptcy proceeding, 00-1530 (AJG), Docket No. 290.

As to the other claims actually addressed by Defendant's motion, numerous factual issues discussed below remain for trial that cannot be determined on this motion. *See generally,* 2005 Erk Aff.; Adler Dec.; Affidavit of Vincent Iturbides dated August 1, 2008; Declaration of Arthur Erk dated August 5, 2008. These factual issues include: whether or not approvals were obtained for co-op advertising charges; whether manufacturing costs charged to RMM were in fact incurred; whether Defendant employed commercially reasonable measures in connection with its handling of RMM product following the Closing of the sale of RMM's assets to Defendant; whether estimated return credits charged to RMM where in fact given to Defendant's retailers; and whether reserves taken in connection with sales of RMM product in foreign territories under the authority of UMLA have been properly liquidated by such foreign licensee to UMLA, and if so, whether or not RMM received its share of such liquidated reserves.

Accordingly, Defendant's request for summary judgment should be denied.

4

## ARGUMENT

### POINT I

### NUMEROUS MATERIAL FACTUAL ISSUES PRECLUDE SUMMARY JUDGMENT IN DEFENDANT'S FAVOR ON THE AUDIT CLAIMS

Under Federal Rule of Civil Procedure 56(c), made applicable to this proceeding by Federal Rule of Bankruptcy 7056, summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether such an issue exists, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir.1997).

Here, the myriad factual issues raised by the audit claims simply cannot be resolved on summary judgment (other than the incorrect distribution fee claim which is the subject of RMM's affirmative motion for summary judgment).

5

Specifically, these factual issues include the following.[3]

## Unsubstantiated "Returns Liability Amount"-$584,180 for September 2001 to August 2002

Per the "Stipulation Modifying Asset Purchase Agreement, Settling Claims and Resolving Disputes; Order Thereon" (the "Stipulation and Order"), a copy of which is annexed to the Affidavit of Michael E. Lehman dated November 2005 ("Lehman Aff.") as Exhibit D, it is indicated that the parties, RMM and UMVD, agreed that the "Returns Liability Amount" was $584,180 (Exhibit D, p. 4, ¶ J), subject however, to RMM's right to audit the agreed upon Returns Liability Amount (Exhibit D, p. 6, ¶ 5, and p. 7, ¶ 10).

Pursuant to ¶ 2(d)(G) of the Asset Purchase Agreement, whereby UMVD acquired all of Debtor's assets, including all existing inventory, UMVD agreed to:

> use commercially reasonable efforts to 'resticker' or otherwise mark any inventory of Records acquired by Buyer hereunder in order to be able to distinguish between Records that were distributed prior to the Closing and Records that were distributed after the Closing."

The whole purpose of this contractual provision was to avoid the current morass wherein it is impossible to ascertain with any certainty an accurate count of post-closing returns of RMM product shipped prior to the closing of the APA.

Accordingly, after the issuance of the audit report, Defendant engaged in various attempts to discern a number of such returns. First, in response to the report, Defendant claimed that the true return liability amount was $ 1,567,608.00. (*See* May 26, 2004 letter annexed to the 2005

---

[3] As noted above, Defendant's motion does not address numerous additional audit claims, including approximately $127,000 in connection with the distribution fee claim. Accordingly, Defendant's motion seeking the dismissal of all of RMM's audit claims cannot be granted. Moreover, it would be improper for Defendant to attempt to address this deficiency in its Reply papers on this motion. Ocean Partners, LLC. v. North River Insurance Co., 546 F. Supp.2d 101, 106 (S.D.N.Y. 2008) (arguments raised in the first instance in a reply brief should not be considered.)

6

Erk Aff. as Ex. H).  Then, Defendant asserted that the return liability amount was 794,020.00,

which was then stated to be $668,851.00, and has now risen again to $714,360.15.

Defendant's most recent effort is explained in the Affidavit of Earl Little submitted by

Defendant on this motion.  Mr. Little's analysis compares the amount of each RMM product

shipped Post-Closing to the amount of Post-Closing returns for that product.  Where the amount

of returns is greater that the amount shipped, Mr. Little presumes that the difference constitutes

returns of RMM product shipped pre-closing.  While there is a superficial appeal to the logic

employed by Mr. Little, it is impossible to determine if a returned product was ultimately

reshipped and sold, or for that matter if Universal simply received a returned phonorecord – for

which RMM is now debited, reshipped that same phonorecord post-closing, had it returned

again, and debited RMM again for the return of that same phonorecord a second (or third, or

fourth) time.  This factual issue is a direct result of Defendant's failure to re-sticker RMM

product it acquired in the sale, as it was contractually required to do.  Since Universal did not

comply with its contractual obligations, there is thus no way to determine whether post-closing

shipments included pre-closing returns leading to inflated claims of returns.

Furthermore, the parties acknowledged the opportunity for mischief in the APA, which

also includes the following provision in connection with RMM's agreement to indemnify

Defendant for post-Closing returns of RMM product (APA, ¶2(d)(G)):

> In addition, Buyer shall not take any action in bad faith which is
> inconsistent with standard business practices in the U.S. recorded
> music industry and is intended solely to maximize the number of
> returns of Records that were distributed prior to closing.

As noted in the 2005 Erk Aff., Defendant's own product shipment reports reflect that

$11,018,954 of product was shipped by Defendant to its resellers from August 2001 through

March 2004.  Of this $11,018,954 in product, Defendant's records reflect that $5,440,608 of pre-

7

existing RMM product was shipped to resellers and $5,578,346 in new UMVD product was shipped to resellers during this time frame, thereby flooding the market with RMM product.

Thus, there are issues of fact as to both the true amount of returns of RMM product shipped prior to the Closing of the APA, and whether Defendant engaged in a bad-faith attempt to maximize the returns of RMM product post-Closing thereby precluding its claim for indemnification for such returns.

### Credits due for New Top-Line LP releases-$61,250.

The RMM/UMVD distribution agreements and amendments (copies of which are annexed to the 2005 Erk Aff. as Exhibit O), required Defendant to credit RMM's account by $1,750 'for each of the first 50 New Top-Line LP releases'. In response to WEC's requests during the audit for a list of top-line releases, Defendant provided a schedule that indicated that there were <u>35</u> "New Top-Line" LP releases. (A copy of that Schedule is annexed to the 2005 Erk Aff. as Exhibit P.) As noted by Mr. Erk in his 2005 Affidavit, "Top-Line prices" in the music industry during 2000 and 2001 ranged from $14.98-$18.98 per L.P.

Defendant has now attempted to place a dollar figure on the 35 albums identified during the audit fieldwork. However, the self-serving, unsupported statements of Earl Little do not even contain specific prices attached to the selections. Rather, there are only Mr. Little's hand-written notations as to which "category" he alleges each selection falls into. And then, Mr. Little provides unsupported testimony as to the categories, merely stating that only the "C-15" category and above had prices greater than **$15.98**, the highest price at which RMM product was sold. These conclusory assertions are insufficient to warrant summary judgment.

First, by Defendant's own admission, four of the selections did in fact have prices of $15.98 and above, and are thus top-line for which payment is owed. As Mr. Little notes,

8

notwithstanding the Defendant sells other products at higher prices, $15.98 was the top price at

which RMM product was sold by Defendant. Accordingly, in order for the 'top-line' provision

in the agreement to have meaning it must apply to those records. *See* <u>Baum v. County of</u>

<u>Rockland</u>, 337 F. Supp. 2d 454, 467 (S.D.N.Y. 2004) (a cardinal maxim of contract

interpretation is that an agreement should not be construed in a manner that renders any

provision meaningless).

Further, Mr. Little does not even offer to state which of the remaining selections may

have been priced at $14.98, which Mr. Erk states would be within the range of top-line releases

during the period in question. 2005 Erk Aff. ¶ 22.

Thus, without the actual prices of the 35 selections, there remain factual issues as to

which of the remaining 35 releases are top-line in addition to the 4 admitted by Defendant.

**Unsubstantiated Costs Charged-Remaining Claim of $342,848**.

Defendant's motion, specifically the Declaration of Becky Carroll, goes a long way in

explaining the true reason why Defendant has not produced supporting documentation to

substantiate the costs charged to RMM. Apparently, Defendant has refused to produce the back-

up invoices because those invoices will not match the costs charged.

The Declaration of Becky Carroll in support of Defendant's motion, admits that the

"Pinckneyville" manufacturing costs charged to RMM by Defendant includes a profit mark-up

from the actual costs incurred. In other words, on top of its Distribution Fee, which compensates

Defendant for its services rendered to RMM, Defendant marked-up its manufacturing charges to

obtain a further profit on sales of RMM product. Nowhere in the parties agreement is there a

provision allowing Universal to profit in such manner. While Defendant is permitted to deduct

"standard manufacturing charges" (with a small 's'), before paying over to RMM the Net

Proceeds from sales of RMM product  (Ross Dec. Ex. 3, ¶14(d)),  "standard manufacturing charges" are not defined in the agreement, let alone defined in a manner permitting a mark-up over and above the cost incurred by Defendant.

Moreover, Defendant's conduct during the audit process and this proceeding belies any argument by Defendant that its interpretation of the agreement permits it to mark-up its costs. Never during the audit process did any representative of Defendant assert that the manufacturing costs charged to RMM were inflated.  And never, not during discovery in this action, or even on this motion, has Defendant produced the actual invoices it received from the Pinckneyville location.  Instead, Defendant has simply steadfastly refused to provide them, asserting claims of unnecessary burden.  If Defendant believed that it was proper to mark-up the manufacturing costs, it would have provided that explanation to WEC during the audit process, rather than pushing WEC to blindly accept its "internal reports," which "accurately" reflect the inflated cost charged to RMM.

It is now clear, however, that it was not unnecessary burden that was the reason for this non-disclosure.  Rather, Defendant has intentionally withheld production of the actual invoices because Defendant knew that the invoices would not support the costs charged.

Accordingly, there is, at the least, an issue of fact as to this claim precluding summary judgment in favor of defendant.

### Unsubstantiated Co-op Costs Charged-Remaining Amount due $50,078.

As noted in the 2005 Erk Aff., cooperative advertising is shared advertising expenses agreed to between the parties.  Pursuant to the parties' agreement, Defendant was permitted to spend up to 3% of Net Billings on co-op advertising.  Importantly, the agreement further provides as follows (*see* Ross Dec., Ex. 3, ¶ 10):

10

> [Defendant] will administer such co-op advertising programs, and
> will provide RMM with appropriate "back-up" documentation with
> respect to such expenditures.

Accordingly, WEC requested back-up documentation supporting the co-op advertising credits charged to RMM. Where no supporting documentation was provided, a claim was made. In response to the report, some limited back-up documentation was provided resulting in a further reduction of the claim. Defendant has been unable to document the remaining claim of $50,078 of purported co-op advertising expenditures.

Defendant's apparent argument that no supporting documentation exists for the remainder, but the co-op advertising expenditures were nevertheless valid is specious. Clearly, where a valid charge was incurred, third-party documentation was generated. *See* Adler Dec., Ex. 2. Defendant's failure to produce such documentation with respect to the remaining claims raises at the least a factual issue as to whether the co-op advertising charge was actually incurred for the benefit of RMM, and further constitutes a breach of Defendant's obligation to maintain and produce back-up documentation for its co-op advertising expenditures.

**Incorrect Distribution Fee Calculation-$203,604.**

As noted above, Defendant agrees with this claim in the amount of $127,398 (although Defendant's motion fails to mention this portion of the claim). The remaining amount of $76,206 concerns the parties differing interpretation of "credits" as used in the distribution fee calculation.

As to the remaining $76,206, Universal does not dispute RMM's mathematical calculations. Rather, Universal claims that RMM has improperly included "credits for co-op advertising" in its calculation of "net billings."

The pertinent contractual provisions concerning the distribution fee are found in ¶¶ 14(i) and 14(c) of the Distribution Agreement:

Paragraph 14(i):

"Uni Distribution Fee" means 16% of Uni's Net Billings …

Paragraph 14(c), then defines Net Billings:

"Net Billings" means Uni's wholesale price for sales hereunder of RMM Product invoiced during each billing month, less returns and credits.

Despite the fact that Defendant identifies co-op advertising retailer discounts as "credits," Defendant argues, without any factual or legal basis to do so, that "credits" are not "credits" as defined in the unambiguous Distribution Agreement. Ignoring the unambiguous and plain meaning of the terms of the distribution agreement, Universal claims that the phrase, "less returns and credits," can somehow be construed to mean returns and other sales adjustments and do[es] not extend to all types of credits whatsoever.

However, the actual terms of the Distribution Agreement say no such thing. The Distribution Agreement is clear on its face, and does not limit the types of credits which may be used in this calculation.

Contractual language is unambiguous where there is a definite and precise meaning, which cannot be misconstrued, and there is no reasonable basis for a difference of opinion. See Hunt Ltd. v. Lifshultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2nd Cir. 1989). If "a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." RJE Corp. v. Northville Industries Corp., 329 F.3d 310 (2nd Cir. 2003) (quoting De Luca v. De Luca, 300 A.D.2d 342, 342, 751 N.Y.S.2d 766, 766 (2d. Dept. 2002) (internal quotations omitted).

Defendant's citation to Gustafson v. Alloyd Co., 513,561, 575 (1995) is thus unavailing.

12

This 5-4 decision interpreting provisions of the U.S. Securities Act, is simply not applicable here given the unambiguous nature of the contract provision at issue. While the Gustafson majority opinion does recite certain maxims of *statutory* construction, Defendant has misplaced them into this dispute regarding an unambiguous contract between private parties. Thus, the maxims pointed to by Defendant and the majority in Gustafson that, "a word is defined by the company it keeps," and that, "[t]his rule we rely upon to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress,'" Gustafson at 575 (internal citations omitted), have no application here. Indeed, the dissenting opinion in Gustafson itself points out that these rules of statutory construction are only employed where an ambiguity exists: "The majority uses the canon in an effort to *create* doubt, not to *reduce* it. The canon applies only in cases of ambiguity, which I do not find in § 2(10). '*Noscitur a sociis* is a well established and useful rule of construction where words are of obscure or doubtful meaning; and then, but only then, its aid may be sought to remove the obscurity or doubt by reference to the associated words.'" Gustafson at 586-87, citing Russell Motor Car Co. v. United States, 261 U.S. 514, 520(1923).

Here, Defendant likewise attempts to create doubt, rather than reduce it, through its improper interpretation of the contract beyond its plain meaning. In this connection, there is no inconsistency within ¶ 14(d) of the agreement because of its separate listing of "returns and credits" and "co-op advertising charges" as deductions from Net Proceeds. One refers to credits, and the other to charges, both of which are deducted in arriving at Net proceeds. Ambiguity only arises from Defendant's impermissible attempt to create it through implication.

The Distribution Agreement sets forth an unqualified definition of "net billings" to be used in connection with the calculation of Universal's distribution fee. The plain language of the

term, "less returns and credits," is not ambiguous or limiting, but rather includes all credits given

by Universal.  Nowhere within the four corners of the distribution agreement is there any

language to support Universal's interpretation that "credits" means only those "credits" it wants

it to mean, excluding those admitted credits it does not want to include.  If Universal wanted to

limit the types of credits to be included in the calculation it could have expressly done so in the

agreement, but it did not.

Accordingly, Plaintiff is entitled to summary judgment for the full amount of the

Incorrect Distribution Fee claim

**Excess Co-op costs charged-$404,298.**

Defendant's motion does not dispute that Defendant exceeded the 3% threshold of co-op

advertising costs approved in the Distribution agreement, nor does Defendant dispute the

calculation of the amount of the co-op advertising costs that exceeded the pre-approved 3%

threshold contained in the Distribution Agreement.

Issues of fact remain as to whether Defendant obtained approval of the excess co-op

advertising.  Defendant asserts they were obtained.  Contrary to this assertion, however,

Defendant produced during discovery in this action a summary listing generated by Defendant of

co-op advertising during the audit period, which reflects alleged approvals obtained from RMM.

This Defendant-prepared document itself reflects approximately $200,000 in co-op advertising

for which no approval is noted. Adler Dec., ¶ 26, Ex 3.  Moreover, Vincent Iturbides, RMM

director of national sales during the Audit period states that during the audit period he

discovered, after-the-fact, certain co-op advertising programs for which Universal did not obtain

approval.  Affidavit of Vincent Iturbides dated August 1, 2008, ¶ 1-4.

14

Thus, issues of fact remain as to whether Defendant breached the agreement by charging

RMM for co-op advertising expenditures that were not approved.

**Incorrect return Credits for CD's and Cassettes-$76,681.**

During the audit period, Defendant charged RMM for purported credits issued to its

customers for defective goods equal to .75% and .5% of their customers' gross purchases of

compact discs (up to June 30, 2000, the credit was .75%, thereafter the credit was equal to .5%).

Defendant also charged RMM for credits purportedly issued to its customers equal to 1.5% of

their gross purchases of cassettes.   In addition to the fact that the distribution agreement does not

permit estimated returns to be deducted, Defendant has not produced any documentation

reflecting that these purported credits for defective goods were actually given to the retailers.

Further, the level of these purported credits bear no relationship to actual defective goods returns.

2005 Erk Aff. ¶ 29.  Further, the validity of these credits are further brought into doubt by the

fact that other major record companies discontinued the practice prior to the audit period at issue

here.  Declaration of Arthur Erk dated August 5, 2008 ("Erk Dec.") ¶ 8.

Accordingly, there are issues of fact remaining as to the validity of these credits and

whether they were actually given to the retailers.

**Non-Liquidation of reserves by UMLA -$269,512.**

Defendant now states, without providing any supporting documentation to support it, that

UMLA did not take any reserves, and thus there were no reserves that should have been

liquidated.  However, this statement is simply inconsistent with the UMLA Agreement, which

provides UMLA with the right to take reserves, and Defendant does not explain why the UMLA

Agreement would include a reserve provision if UMLA does not take reserves.

15

Moreover, Defendant's motion is glaringly silent as to whether the reserves were in fact taken by its foreign affiliates in the respective territories where the product was sold. Likewise, Defendant does not state that any reserves held by the foreign affiliates were timely liquidated, or if they were liquidated, that Defendant ultimately credited RMM with its contractual share of those liquidated reserves. Defendant has refused to produce any documentation in connection with these issues. These actual issues preclude summary judgment in Defendant's favor on this claim.

In large part, the numerous factual issues remaining on RMM's audit claims is the product of Defendant's failure to produce documentation to support its accountings to RMM. Incredibly, on this motion Defendant now attempts to use its recalcitrance as a sword, notwithstanding the myriad factual issues they have created. In this connection, Defendant also attempts to take advantage of RMM's alleged silence as to breaches by Universal related to excess co-op advertising charges and estimated returns credits charged to RMM, to skirt its liability. But, Defendant fails to note that failure to object to a breach of contract will only act as a waiver of the claim where the non-objecting party had actual knowledge of the claim and intentionally chose to waive it. Liebowitz v. Elsevier Science Ltd., 927 F. Supp. 688, 705 (S.D.N.Y. 1996) (waiver of a contract claim is "the voluntary abandonment or relinquishment of a known right. It is essentially a matter of intent which must be proved"); State of Washington v. Leyser 196 Cal. App. 3d 451, 460 (Court of Appeal 1987) (Under California law, waiver is the intentional relinquishment of a known right). Here, the record is devoid of any evidence that would support RMM's intentional waiver of the claims.

16

**POINT II**

**DEFENDANT'S TANGENTIAL REQUEST TO DISQUALIFY
ANDREW ADLER AS AN EXPERT WITNESS IS WHOLLY
MISPLACED AND WITHOUT MERIT**

As explained above, the numerous factual issues that remain in connection with the audit

claims precludes summary judgment in Defendant's favor, irrespective of any expert testimony

from Mr. Adler that may be introduced at trial.  In this connection, Defendant mistakenly colors

much of Mr. Adler's factual testimony in this matter as expert opinion.  To the contrary, Mr.

Adler has reviewed Defendant's books and records to make factual determinations as to its

accuracy.  In this connection, Defendant does not dispute any of Mr. Adler's factual calculations.

Rather, Defendant's disputes in large part concern legal issues as to interpretations of the subject

contracts.  Mr. Adler is not being proffered to opine in that regard.

In any event, Mr. Adler is more than sufficiently qualified to have conducted the

fieldwork and rendered the reports here.  Mr. Adler is a certified public accountant with over

fifteens years experience and ten years experience in conducting royalty examinations.  (Adler

Depo. 11:17-16:22).  Mr. Adler joined WEC in 1999 where he has been actively and

continuously engaged in music industry examinations since that time (Adler Dep. 21:11-25:5).

While it is true that he has not yet been qualified as an expert in a legal proceeding, there must

always be a first time, and here, to the extent any opinions are offered by him in this proceeding

in connection with his expertise gained over his career, it is appropriate for the Court, or the fact

finder at trial, to consider them.

Moreover, in a few instances, such as the accepted range of top-line releases, RMM relies

upon the testimony of Arthur Erk, a partner in WEC, for his opinion gleaned from his thirty

17

years of experience in music industry audits.  As reflected on Mr. Erk's C.V., (annexed to the

Erk Dec. as Exhibit 1), there is no doubt that Mr. Erk's thirty years experience in the music

industry, including over 20 examinations of Defendant, Erk Dec. ¶ 2,  provides him with the

necessary qualifications to opine as to music industry matters in this proceeding.

Similarly, the reliable methods and procedures employed by WEC here are typical of

those employed by WEC in connection with those music industry audits and reflect standard

methods of sampling, and review of back up third-party documentation, to verify the accountings

of the examined company.  Erk Dec. ¶ 4-6.  There is nothing novel or radical in the basic

procedures employed here that would warrant a <u>Daubert</u> challenge to their reliability.  Likewise,

the determinations set forth in the Reports, as amended, are largely factual in nature, representing

mathematical calculations that Defendant does not dispute.

18

## CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment and the disqualification of Andrew Adler as an Expert Witness, should be denied in its entirety.

Dated: New York, New York
        August 5, 2008

                                        CAPLAN & ROSS, LLP

                                        By:_____
                                            Brian D. Caplan (BC 1713)
                                            Jonathan J. Ross (JR 0581)
                                        100 Park Avenue, 18th Floor
                                        New York, New York  10017
                                        (212) 973-2376

                                        *Counsel for Plaintiff*

19