UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| RMM RECORDS & VIDEO CORP., | : | Case No. 00-15350 (AJG) |
|  | : | (Confirmed Case) |
| Debtor. | : |  |

─────────────────────────────────────

|  |  |  |
|---|---|---|
| In re | : |  |
|  | : |  |
| RMM RECORDS & VIDEO CORP., | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | Adv. Pro. No. 06-01351 (AJG) |
|  | : |  |
| UNIVERSAL MUSIC & VIDEO DISTRIBUTION CO., | : |  |
|  | : |  |
| Defendant. | : |  |

─────────────────────────────────────

OPINION (1) GRANTING, IN PART, AND DENYING, IN PART, MOTIONS FOR
SUMMARY JUDGMENT, AND (2) DENYING UNIVERSAL'S MOTION FOR AN ORDER
BARRING ANDREW ADLER AS AN EXPERT WITNESS

A P P E A R A N C E S

LABATON SUCHAROW & RUDOFF LLP
Attorneys for Plaintiff
New York, New York

   Brian D. Caplan, Esq.
   Jonathon J. Ross, Esq.
     Of Counsel

JENNER & BLOCK LLP

Attorneys for Defendant
New York, New York

           Andrew Bart, Esq.
           Joshua A. Block, Esq.
           Of Counsel


ARTHUR J. GONZALEZ
United States Bankruptcy Judge


      This adversary proceeding stems from a sale by the debtor, RMM Records and Video Corporation ("RMM"), a New York corporation, and a purchase by Universal Music and Video Distribution, Corp. ( "UMVD"), a Delaware corporation, of all of the assets and business of RMM, which transaction was approved by the Bankruptcy Court.  The parties had a business relationship prior to the sale in which Universal had been the distributer of RMM's product.  Consequently, the purchase agreement memorializing the asset sale incorporated certain provisions of pre-petition agreements that RMM had entered into with UMVD and with Universal Music Latin America, Inc. ("UMLA"), an affiliate of UMVD.  (For ease of reference, hereinafter, UMVD, either alone or together with UMLA will be referred to as "Universal").

      Pursuant to their agreements, Universal was obligated to pay RMM for the distribution of RMM product.  In connection, with the asset sale, RMM was afforded certain rights to audit Universal's books and records in connection with the distribution of RMM product.  Based upon its audits, RMM has asserted certain claims for underpayments of amounts due.  Universal has interposed various affirmative defenses and counterclaims, including that RMM has breached the sale agreement thereby entitling Universal to indemnification.  The parties have moved for summary judgment on various of their claims and counterclaims.

2

*Factual Background*

RMM was a record label specializing in the salsa and other Latino music markets.  RMM and Universal entered into a Distribution and Pressing Agreement dated November 15, 1995, and amended on several occasions thereafter (the "Distribution Agreement"), pursuant to which Universal distributed RMM's products in the United States.  RMM and Universal's affiliate, UMLA, entered into a licensing agreement, dated as of December 19, 1997 (the "UMLA Licensing Agreement"), pursuant to which RMM granted UMLA the right to distribute RMM products outside the United States.

RMM filed for bankruptcy protection in November 2000 as a result of a civil judgment against it.  To satisfy that civil judgment and its creditors, RMM entered into an Asset Purchase Agreement (the "APA") with Universal, in which RMM agreed to sell its catalog of master recordings and artist agreements to Universal in exchange for an up-front cash payment, Universal's forgiveness of certain debt, and Universal's issuance of a Promissory Note (the "Note") to RMM.  The APA was entered into on April 30, 2001 and closed on August 16, 2001 (the "Closing Date").

Relevant to various of the Claims and Counterclaims, the APA included provision 11(c)(i), pursuant to which RMM agreed to indemnify Universal.  Subject to certain limitations, this section provided, in relevant part, that

> [RMM] agrees to fully indemnify and hold harmless Universal and its Affiliates . . . against and in respect of any and all liabilities, losses, damages, deficiencies, costs and expenses (including the reasonable fees and expenses of investigation and counsel) (collectively, "Losses") arising out of or resulting from (A) any misrepresentation or any breach of the representations, warranties, covenants and agreements made or deemed made by [RMM] in or in connection with this Agreement, (B) any breach of any covenant or agreement made by [RMM] in this Agreement or in any certificate furnished to [Universal] in

3

accordance with this Agreement or in connection with the transactions contemplated by this Agreement, (C) any Excluded Liabilities, and (D) any actions, suits, proceedings, investigations, claims, demands, assessments and judgments incidental to the foregoing or the enforcement of such indemnification.

Among other sections of the APA relevant to the parties' motions, APA section 3(d)(i) provided that RMM could audit Universal's books and records concerning various matters. Included within the ambit of the permitted audits were records for the two-year period prior to the Closing Date.  These audits were for the purpose of verifying that Universal had made proper payments to RMM under the Distribution Agreement and the UMLA Licensing Agreement.

In addition, RMM was permitted to audit "those monthly accounting statements relating to the issuance of credits to customers for returns during the period commencing on the Closing Date and continuing until the date that is one (1) year thereafter."  APA § 3(d)(iii).  This latter provision was included because the APA provided that RMM would bear the cost of any RMM product that had been distributed prior to the Closing Date but returned after the Closing Date. Universal has a full return policy for customers in good standing and the Distribution Agreement provides that any returns of RMM product are deducted from the sales figure to arrive at the net proceeds paid to RMM.  The parties expected that a certain amount of RMM product that had been sold prior to the Closing Date would be returned after the Closing Date and the APA made clear that RMM would bear responsibility for the returns of those items.[1]  To accomplish this

---

[1]Section 2(d)(i)(G) of the APA provides, in relevant part, that Universal did not assume certain of the liabilities and obligations of RMM, including

> all obligations and liabilities arising out of the issuance of credits to customers for returns of Records sold or distributed for sale prior to the Closing (as determined by [Universal] in its good faith discretion).  In the event that any such Records are returned to Buyer on or after the Closing Date, Buyer shall be authorized to accept all such returns and to issue credits therefor (all in a manner consistent with [Universal's] practices under the [Distribution Agreement], it being understood, acknowledged and agreed that all such credits shall be treated as amounts for which [Universal] is entitled to be indemnified by [RMM] under Section 11(c).

purpose, section 2(d)(i)(G) of the APA indicated that Universal would be entitled to indemnification under section 11(c) of the APA for the cost of any RMM product distributed prior to the Closing Date but returned after the Closing Date (the "Return Liability").  Any underpayments uncovered in the audits would be treated as additions to the purchase price, with any disputes as to such amounts resolved by the Bankruptcy Court.

In connection with the Closing Date of the APA, Universal issued to RMM the Note in the principal amount of $1,300,000, with an interest rate of 5% and a maturity date of August 16, 2002.  The Note, at paragraphs 3-4,[2] confirms that it is subject to all terms of the APA and to Universal's right of offset pursuant to Section 11(d) of the APA.

On March 29, 2002, this Court entered its order confirming the Debtor's Chapter 11 plan of liquidation, pursuant to which all of RMM's creditors were paid in full.  Shortly after RMM's plan was confirmed, the Court granted RMM's request to engage special litigation counsel to pursue malpractice claims against attorneys who previously represented RMM.

In June 2002, RMM commenced an action for legal malpractice against Peter Thomas Paterno (the "Paterno Action").  In July 2004, the United States District Court for the Southern District of New York referred the Paterno Action to this Court to address whether RMM had standing to prosecute the action.  Subsequently, this Court issued a Report and Recommendation: Proposed Findings of Facts and Conclusions of Law, dated December 9.

---

[2]The Note provides at paragraphs 3-4 that
> This is the Note referred to in Section 3(a)(iii) of, and is subject in all respects to the terms of, that certain Asset Purchase Agreement, dated as of April 30, 2001, between [Universal] and RMM . . . the terms and conditions of which are incorporated herein by reference. . .
> This Note and the amounts due to RMM hereunder are subject in all respects to [Universal's] right of offset pursuant to the terms of Section 11(d) of the [APA].

2005.  (Adv. Pro. 04-00004, Dkt. No. 60.)   In that report, the Court recommended granting

Paterno's motion for judgment on the pleadings, based on its conclusion that the "APA

incorporated all of RMM's assets, including the legal malpractice claims asserted [against the

Paterno firm]."   After issuance of the report concluding that the Paterno Action was an asset

transferred to Universal pursuant to the APA, the parties to the Paterno Action agreed to a

settlement and entered into a stipulation dismissing the Paterno Action.

Also subsequent to the APA, RMM commenced an action against other former attorneys,

the Castellanos Law Firm and Alfredo Antonio Castellanos Bayouth (together, "Castellanos").

In that action, RMM sought damages for legal malpractice and sought to disallow an $80,000

unsecured claim for unpaid attorneys' fees asserted by Castellanos in the RMM bankruptcy case.

RMM and Castellanos agreed to a settlement that dismissed the malpractice claims and reduced

the unsecured $80,000 claim to $42,000.

*The Parties Modify the Asset Purchase Agreement*

Several issues arose post-APA that resulted in RMM and Universal entering into a

stipulation and settlement modifying the APA on February 5, 2003 (the "Stipulation").  The

Stipulation provided Universal with various set-offs relating to certain then-unresolved claims.

Those amounts were deducted from the amount due on the Note.[3]  One reduction was for Returns

Liability in the amount of $584,180 - that was the amount that Universal determined was owing

following the first anniversary of the Closing Date.  RMM, however, retained the right to audit

---

[3]Pursuant to section 11(d) of the APA, Universal could offset from the Note any amounts due it from RMM.  The
section provides, in relevant part, that
> At [Universal's] option, [Universal] may, at any time and from time to time on or before the
> Maturity Date of the Note, offset any amount due to it from Seller pursuant to Section 11(c) by
> reduction of the then-outstanding amount of the Note, including the principal thereof and any
> accrued and unpaid interest thereon. [Universal shall promptly notify [RMM] in writing of any
> such reduction.

Universal's books and records with respect to returns made for that one-year period after the Closing Date. Indeed, the Stipulation provided that, with the incorporation of certain modifications, the audit rights contained in section 3(d) of the APA remained in full force and effect. One of the modifications in the Stipulation, subject to certain possible adjustments, extended RMM's right to conduct an audit to two years after the APA Closing Date. Specific reference was made to the application of the extension to audit rights concerning the Returns Liability. Thus, RMM was afforded two years after the Closing Date to conduct an audit for product returned during the one-year period after the Closing Date. In addition, the Stipulation extended the maturity date of the Note[4] and provided for Universal to make an immediate payment to RMM under the Note in the amount of $267,495.95 plus accrued interest.

Subsequent to the Stipulation, RMM had audits performed pursuant to its rights under the APA and the Stipulation. RMM engaged an accounting firm, Wlodinger Erk & Chanzis ("WEC"), to examine Universal's books regarding the distribution of RMM's products from August 1, 1999 through July 31, 2001. Arthur Erk, a member of WEC, supervised the audits, which took place from November to December 2003. Andrew Adler, an accountant associated with WEC, performed auditing duties, and produced two audit reports, one for UMVD and the other for UMLA, which reports alleged that there were deficiencies in Universal's accounting statements and recordkeeping.

On October 31, 2003, the Note's date of maturity, Universal notified RMM of certain offsets it was applying to the Note pursuant to the terms of the APA, leaving a balance due under the Note of $332,841.80. Universal also notified RMM that because of RMM's breaches of the

---

[4]It is undisputed that the Stipulation operates to extend the maturity date of the Note to October 31, 2003.

APA and related third-party claims against Universal, Universal could incur losses or damages greater than the amount due on the Note.  Universal simultaneously advised RMM that, although $332,841.81 was otherwise payable under the Note, it would not make a payment of the balance due on the Note because of third-party claims by Celia Cruz's estate that reduced the amount due to zero dollars.

## PROCEDURAL BACKGROUND

On November 22, 2005, RMM filed a motion seeking, among other things, payment on the Note.  RMM also asserted claims (the "Audit Claims") for additional payments of amounts due under the parties' agreements, based upon its examination of Universal's books and records, conducted pursuant to the APA.

Universal opposed RMM's motion concerning the demand for payment on the Note.  In addition, Universal asserted various affirmative defenses and counterclaims for, among other things, breaches of the APA while also arguing that RMM should have filed a formal adversary proceeding.[5]  The Court agreed that an adversary proceeding was the proper procedural mechanism and converted RMM's motion to an adversary proceeding by Order, dated March 1, 2006 (the "Consent Order").[6]

On May 15, 2006, RMM moved for summary judgment and for an entry of final judgment under FED.R.CIV.P. 54(b).  Specifically, RMM requested the Court award it the agreed

_____

[5]Universal objected to proceeding by motion, arguing that because monetary relief was sought, the motion should have been brought as an adversary proceeding.

[6]The Consent Order was entered in RMM's bankruptcy case (No. 00-15350(AJG), Doc. #290).  Pursuant to the Consent Order, two affidavits, each dated November 22, 2005 (No. 00-15350(AJG), Doc. #273), that had been filed by Michael E. Lehman and Arthur Erk in support of RMM's motion on the Note were deemed to be the Complaint. In addition, Universal's opposition, dated January 18, 2006 (No. 00-15350(AJG), Doc. #285), to the motion on the Note was deemed to be an Answer and Counterclaim.

8

upon balance of the Note amounting to $332,841.81 plus interest accrued from October 31, 2003. Universal argued that its asserted affirmative defenses and counterclaims acted as a defense to, and precluded entry of summary judgment, on the Note claim because the Note and the APA are "inextricably intertwined." Universal referred to its affirmative defenses and counterclaims as (1) the Additional Returns Liability Amount Claim, (2) the Celia Cruz Claim, and (3) the Paterno and Castellanos Malpractice Claims, and (4) the BMG Direct Claim.

On June 7, 2007, the Court granted RMM's Motion for Summary Judgment on the promissory note claim and entered an Order, dated July 9, 2007 (the "July 9 Order") granting RMM an award of $332,841.80 plus nine percent interest per annum in accordance with N.Y. C.P.L.R. 5004. The Court concluded that Universal's asserted counterclaims or affirmative defenses - the Additional Returns Liability Claim, the Celia Cruz Claim, the Malpractice Claims, and BMG Directs Claims - did not constitute bona fide defenses to RMM's promissory note claim. Including an interest calculation of $109,847.78, the total award was $442,689.58. Although judgment on the note was to be entered, the Court determined that because RMM had no assets other than the Note, it would be prudent to stay enforcement of the judgment until resolution of the counterclaims.

Universal filed a motion requesting reconsideration of the July 9 Order. Universal objected to the interest rate calculation, arguing that the Note's interest rate of five percent should apply to the period after the Note's maturity date and before the entry of judgment, rather than New York's statutory rate of nine percent set forth in C.P.L.R. 5004. In an opinion, dated July 31, 2007, the Court denied Universal's objection, finding that the language of the Note showed that the parties did not intend for the contractual interest rate to continue beyond the

9

Note's maturity date, and that New York's statutory rate of nine percent should apply to the period after the Note's maturity date and through the date judgment was entered.

An order was signed on August 1, 2007 staying the enforcement of the July 9 Order and judgment was signed on August 13, 2007.

THE SUMMARY JUDGMENT MOTIONS

By motion, dated July 7, 2008, RMM moves for partial summary judgment seeking (i) entry of an order awarding it $203,604, plus pre-judgment interest on one of its Audit Claims - the "Incorrect Distribution Fee" claim, and (ii) dismissal of Universal's counterclaims - the Celia Cruz," Paterno, and Castellanos counterclaims.[7]

Universal opposes RMM's partial summary judgment motion and dismissal motion. In addition, by motion, dated July 7, 2008, Universal moves for summary judgment (i) on its Returns Liability Counterclaim in the amount of $130,180.35, and (ii) dismissing certain of RMM's Audit Claims. Universal also seeks entry of an order, pursuant to Federal Rule of Evidence 702, disqualifying Andrew Adler as an expert witness.

A hearing on the summary judgment motions was conducted before this Court on September 24, 2008 (the "Hearing").

DISCUSSION

*Motion to Disqualify Adler as an Expert Witness*

The Court will first discuss Universal's motion to disqualify Adler as an expert witness,

---

[7]RMM also sought summary judgment for dismissal of the BMG Direct Counterclaim. Universal has since conceded that the BMG Direct counterclaim was resolved by this Court's ruling in *RMM Records & Video Corp. v. Universal Music & Video Distribution Co., (In re RMM Records & Video Corp.)*, 372 B.R. 603 (Bankr. S.D.N.Y. 2007). Universal asserts, however, that it reserves the right to challenge such dismissal in connection with any appeal from final judgment in this action.

as a ruling on that motion could impact both parties' respective motions for summary judgment.

RMM hired Adler's employer, WEC, to perform audit work relating to the RMM - Universal agreements. Adler performed the work in 2002 or 2003 (Adler was unclear in his deposition testimony on exact dates). Based largely on his audit work, WEC issued two audit reports to RMM in January 2004. The audit reports were based principally on Adler's observations during his field work visiting Universal's offices and examining their documents and materials. Adler drafted the audit reports and reviewed them with his supervisor Erk before WEC finalized the reports and sent them to RMM. The audit reports provide much of the alleged factual background for RMM's adversary complaint.

Universal urges the Court to reject Adler's testimony. Universal argues that Adler's lack of experience bars his qualification as an expert witness. As support, Universal states that no other court has qualified Adler as an expert, that Adler has "little experience conducting audits of the types of record distribution agreements" in the case, and that Adler has only performed three audits related to record distribution agreements.

Even if the Court qualifies Adler as an expert witness, Universal argues that Adler's testimony should be barred under Federal Rule of Evidence 702 because Adler used unreliable methods in creating the audit reports.

RMM's response contains two main thrusts. First, RMM responds that Adler's testimony is not expert testimony. Second, RMM argues that Adler's extensive experience sufficiently qualifies him to be an expert even if it would be the first time he was qualified as an expert in a legal proceeding. RMM contends that Adler and the firm that employed him used "reliable methods and procedures" that are "typical" of those used in music industry audits. RMM further

argues that the determinations set forth in the audit reports are "largely factual" mathematical

calculations.

For reasons discussed more fully below, the Court agrees with RMM's primary argument

that Adler's audit reports and the testimony from them are not expert opinion, controlled by

Federal Rule of Evidence 702, but are instead lay opinion testimony allowed by Federal Rule of

Evidence 701.  The Court will thus admit Adler's testimony under Rule 701 mainly because his

findings and conclusions are drawn from his audit work and own perceptions, and are not based

solely on his accounting expertise.

Federal Rule of Evidence 701, entitled "Opinion Testimony by Lay Witnesses,"

provides –

> If the witness is not testifying as an expert, the witness' testimony in the
> form of opinions or inferences is limited to those opinions or inferences which are
> (a) rationally based on the perception of the witness, and (b) helpful to a clear
> understanding of the witness' testimony or the determination of a fact in issue, and
> (c) not based on scientific, technical, or other specialized knowledge within the
> scope of Rule 702.[8]

Federal Rules of Evidence 701 and 702 combine to prevent a witness from seeking to

avoid the heightened requirements for expert testimony under Rule 702 by offering his testimony

as a lay opinion.  Thus, lay opinion testimony is not permitted, under 701(c), to be based on

"scientific, technical, or other specialized knowledge within the scope of Rule 702" – the rule

governing expert testimony.  Congress intentionally modified Rule 701 in 2000 by adding 701(c)

---

[8]Fed. Rule of Evid. 702 states--
      If scientific, technical, or other specialized knowledge will assist the trier of fact to  understand the
evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or
education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the
principles and methods reliably to the facts of the case.

"to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded

through the simple expedient of proffering an expert in lay witness clothing." *Bank of China,*

*New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (quoting FED.R.EVID. 701

advisory committee's note (2000).

     Simply because a witness can be qualified as an expert, however, does not bar that

witness from testifying as a lay witness.  The rules do "not distinguish between expert and lay

*witnesses*, but rather expert and lay *testimony*.  Certainly, it is possible for the same witness to

provide both lay and expert testimony in a single case." FED.R.EVID. 701 advisory committee's

note (2000).  In fact, the Second Circuit has held that a witness can testify pursuant to Rule 701

even though he "has specialized knowledge, or that he carried out the investigation because of

that knowledge . . . so long as the testimony was based on the investigation and reflected his

investigatory findings and conclusions, and was not rooted exclusively in his expertise." *Bank of*

*China*, 359 F.3d at 181.

     A recent case involving similar facts – a challenge to the lay witness testimony of an

accountant – confirms that Adler's testimony should be permitted, even if Adler "was aided in

forming his perceptions by . . . his training and experience, to understand what he saw." *Fox v.*

*Koplik & Siegal (In re Perry H. Koplik & Sons, Inc.)*, 382 B.R. 599, 603 (Bankr. S.D.N.Y.

2008).  There, the Court reviewed Second Circuit cases and expressed the Circuit's "nuanced

standard" that allows lay testimony, even if the witness has specialized expertise, if such

testimony is based on the witness's perceptions. *Id.* at 601-03 (discussing *Bank of China* and

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007)).

     The *Perry H. Koplik* Court also finely articulated the boundaries of permissible lay

opinion testimony under like circumstances, permitting testimony reflecting perceptions of the

witness as to what happened, while excluding testimony as to: "(a) whether what he perceived

was right or wrong; (b) what should have been done; (c) what is customary in business practice;

or (d) what his training and experience tell him about appropriate conduct in these cases." *Id.* at

603 (emphasis removed).

Based on the precedent in the Second Circuit, the Court will allow Adler's testimony

under Rule 701.  Adler clearly based his audit report and testimony on his own perceptions

stemming directly from his work, which supports the conclusion that it is lay witness testimony.

*See Bank of China*, 359 F.3d at 181.  Adler's audit report and his deposition testimony were

based on Adler's personal review of relevant documents, such as the relevant agreements,

royalty statements, backup invoices, and schedules.  The audit report and testimony reflect that

review and hardly constitute "scientific, technical, or other specialized knowledge."  The audit

report and testimony contain, in essence, what an auditor says one party owes another under a

licensing agreement.  That is not the type of testimony that results "from a process of reasoning

which can be mastered only by specialists in the field."  *In re WorldCom, Inc. Sec. Litig.*, No. 02

Civ. 3288 (DLC), 2005 WL 675601, at *2 (S.D.N.Y. Mar. 24, 2005) (citing Fed. R. Evid. 701

advisory committee's note (2000)).  Furthermore, although Alder's specialized background as an

accountant may be why he was asked to offer his report and testimony, that report and testimony

were not "rooted exclusively" in such expertise.  *See Bank of China*, 359 F.3d at 181.  Finally,

the audit report and testimony do not contain the type of information that the court in *Perry H.*

*Koplik* counseled against allowing, such as "what his training and experience tell him about

appropriate conduct in these cases."  *In re Perry H. Koplik*, 382 B.R. at 603.

14

Adler Would Have Qualified as an Expert Witness

Even if the Court had not found Adler's testimony admissible as lay testimony, the Court

would have found Adler qualified to offer expert testimony.  Rule 702 requires that an expert be

qualified "by knowledge, skill, experience, training or education."  FED. R. EVID. 702.  The

standard under Rule 702 is flexible, and the Court has broad discretion to determine the

qualifications of witnesses.  *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 142

(S.D.N.Y. 2003).

Although Universal cites Adler's lack of experience "conducting audits of the types of

record distribution agreements at issue," that does not bar his qualification as an expert.  Adler is

a certified public accountant, holds an MBA degree, has experience preparing audit reports, has

ten years experience conducting royalty licensing audits for entertainment company clients, and

spent approximately 75% of his work time on royalty engagements during the time of the audit

report.  Such experience qualifies him to offer expert testimony.  The specificity that Universal

demands is not required by Rule 702 – in other words, even if Adler has little experience

conducting audits of the specific types of record distribution agreements at issue that does not

undermine his otherwise sufficient qualifications.  *See Ulico Cas. Co. v. Clover Capital Mgmt.*,

217 F. Supp. 2d 311, 317 (N.D.N.Y. 2002) (rejecting defendant's challenge that an expert with

extensive qualifications in analyzing bonds was not qualified because of a lack of experience

with the specific type of bond at issue, stating "[t]he law does not insist on such narrow

qualifications"); *Wechsler*, 381 F. Supp. 2d at 143 (the court qualified as an expert an accountant

with seventeen years of experience even though he did not have experience reviewing financial

records of *health care* providers, stating "Rule 702 does not require such specificity among the

15

backgrounds of proposed expert witnesses”).

As a further point, the relative strength or weakness of Adler’s credentials affect the weight, rather than the admissibility, of Adler’s testimony.  *Id.*; *see also Clarke v. LR Sys.*, 219 F. Supp. 2d 323, 333 (E.D.N.Y. 2002) (“Disputes about the strength of an expert's credentials, faults in an expert's decision to use a particular methodology, or the lack of textual authority for an expert's opinion ‘go to the weight, not the admissibility, of his testimony.’”) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

Reliability of Adler’s Methods

Universal argues that even if the Court were to qualify Adler as an expert, his testimony should not be considered under the Supreme Court’s *Daubert* criteria because he used unreliable methods and principles.  Although the Court does not need to reach the issue since it considers Adler’s audit report and deposition testimony to be lay opinion testimony, the Court will briefly address it for the sake of completeness.

In *Daubert*, the Supreme Court held that Federal Rule of Evidence 702 imposes a “gate-keeping” duty on federal judges to ensure the reliability of scientific testimony.  The *Daubert* Court identified four factors to be considered in determining the admissibility of expert testimony:  “(1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) the potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.”  *Houlihan v. Marriott Int’l., Inc.*, No. 00 Civ. 7439(RCC), 2003 WL 22271206 at *3 (S.D.N.Y. Sept. 30, 2003) (citing *Daubert*, 509 U.S. at 592-94).  Although scientific testimony was the original subject of the

Supreme Court's analysis, the Court has since held that *Daubert's* criteria may also be applied to other types of expert testimony. *See Kumho Tire v. Carmichael*, 526 U.S. 137, 147 (1999).

Universal argues that Adler used unreliable methods, such as his "feel and discretion," in demanding back-up information and that his accounting firm had no "formal policies and procedures" regarding how to conduct a royalty audit. Universal further argues that Adler's "rigid demand for paper invoices" is outside the mainstream of auditing practices. RMM counters that the methods used by WEC are typical of those employed in music industry audits and reflect standard methods of sampling, and that it reviewed back-up third-party documentation to verify the accountings.

The Court would deny Universal's request to preclude Adler's testimony under *Daubert* for two main reasons. First, since the Court is the fact-finder at a bench trial, it applies the *Daubert* gate-keeping standard more flexibly, as the concerns for juror confusion or potential prejudice are not present. *See, e.g., Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 629 (S.D.N.Y. 2007) ("It is well-established that the *Daubert* gatekeeping standard is applied more flexibly when the judge is the factfinder, and accordingly more rigorously when the expert testimony is to be presented to a jury."); *see also Green Mountain Chrysler Plymouth Dodge v. Crombie*, 508 F. Supp. 2d 295, 312 (D. Vt. 2007) ("The Rules' liberal approach to the admission of expert testimony is particularly appropriate in a bench trial . . . the Court can weigh the evidence admitted without being unduly swayed by a witness's designation as an expert.").

Second, courts in the Second Circuit apply a more flexible standard to testimony that is not scientific, like Adler's. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab.*, No. 04 Civ. 2389, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008) (the "test for reliability is flexible,

especially in this case where [the witness's] expertise is non-scientific and is based on his experience"); *Houlihan*, 2003 WL 22271206 at *3 (citations omitted) ("[a]lthough a court may look to the *Daubert* criteria when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination.  For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods.").

From the materials presented by the parties and from Adler's deposition testimony, it is not clear that Adler used unreliable methods in creating the audit report.  Particularly, Adler's requests for backup information, the chief source of Universal's complaint about Adler's reliability, seem designed to increase the accuracy of his audit report and conceivably could make it more reliable under certain circumstances.  Universal will, of course, have the opportunity at trial to raise any questions or doubts regarding the reliability of Adler and WEC's methods.  *See Houlihan v. Marriott Int'l, Inc.*, No. 00 Civ. 7439, 2003 WL 22271206, at *4 (S.D.N.Y. Sept. 30, 2003) ("Defendant will have ample opportunity on cross examination to raise any questions or doubts with respect to [witness's] credentials or the reliability of his testimony.").  The Supreme Court has emphasized that the trial court should be flexible when making a determination of the admissibility of expert testimony evidence and stressed that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Arnold v. Dow Chem. Co.*, 32 F. Supp. 2d 584, 587 (E.D.N.Y. 1999) (quoting *Daubert*, 509 U.S. at 595.

18

*Motions for Summary Judgment*

Fed. R. Civ. P. 56(c) incorporated into bankruptcy practice by Fed. R. Bankr. P. 7056

provides that summary judgment shall be rendered "if the pleadings, depositions, answers to

interrogatories, and admissions of file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Rule 56(c) specifies that to preclude summary judgment, the fact in dispute must be

material. Substantive law determines the facts that are material. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If a fact is material, it is then

necessary to see if the dispute about that material fact is genuine, "that is, if the evidence is such

that a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby*, *Id*., at

248. If the fact may be reasonably resolved in favor of either party, then there is a genuine

factual issue that may only be resolved by the trier of facts and summary judgment will be

denied. *Id.* at 250. If, however, the evidence "is so one-sided that one party must prevail as a

matter of law," then summary judgment will be granted. *Id*. at 252. On considering a motion for

summary judgment, the evidence is viewed in the light most favorable to the non-moving party.

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142

(1970).

After the non-moving party to the summary judgment motion has been afforded a

sufficient time for discovery, summary judgment must be entered against it where it fails to

make a showing sufficient to establish the existence of an element essential to its case and on

which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317,322 106 S.Ct.

2548, 2552 (1986). It is said that there is no genuine issue concerning any material fact because

19

"a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  477 U.S. at 323, 106 S.Ct. at 2552.  In this manner, the summary judgment standard is similar to the directed verdict standard under Fed. R. Civ. P. 50(a).  *Id.*

The summary judgment standard is interpreted in a way to support its primary goal of "dispos[ing] of factually unsupported claims or defenses."  *Celotex*, 477 U.S. at 323-24, 106 S.Ct. at 2553.  The summary judgment movant meets its burden by "'showing' . . . that there is an absence of evidence to support the nonmoving party's case."  477 U.S. at 325, 106 S.Ct. at 2554.  Application of the summary judgment procedure is not a disfavored procedural shortcut, but an integral part of the Federal Rules where there are no triable factual issues.  *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

The Audit Claims

As previously noted, pursuant to the APA and the Stipulation, RMM was afforded the right to audit certain of the claims that Universal asserted under the APA, the Distribution Agreement and the UMLA Licensing Agreement.  Any disputes as to the correct amounts were to be resolved by the Bankruptcy Court.  The parties now move for summary judgment with respect to certain of the Audit Claims that RMM asserts.  RMM and Universal move for summary judgment with respect to the Incorrect Distribution Fee Claim, with RMM arguing that, as a matter of law, it is entitled to the amount sought and Universal arguing that the claim should be dismissed.  Universal moves for summary judgment in its favor with respect to the Returns Liability Claim, which relief RMM opposes arguing that there are factual issues in dispute.  Universal also moves for summary judgment seeking dismissal of several of RMM's other Audit

Claims, arguing that RMM has not produced any evidence to support the claims.  RMM

maintains that factual disputes preclude entry of summary judgment on these other Audit Claims.

### The Incorrect Distribution Fee Claim

As previously noted, both RMM and Universal have moved for summary judgment on

one of the Audit Claims, which RMM has labeled the "Incorrect Distribution Fee Claim."  RMM

seeks to be awarded $203,604 plus prejudgment interest for this claim, and Universal seeks to

have this audit claim dismissed.  Both parties assert that, with respect to this claim, the

Distribution Agreement is plain and unambiguous and that its interpretation can be resolved as a

matter of law.

The alleged Incorrect Distribution Fee Claim relates to the calculation of the fee to which

Universal was entitled for distributing RMM product.  RMM contends that the fee Universal

calculated exceeded the correct amount due by $203,604.  Pursuant to the Distribution

Agreement, Universal was entitled to a fee based on a percentage of "net billings" received from

distributing RMM product.  As such, paragraph 14(i) of the Distribution Agreement provides

that Universal's distribution fee was to be a certain percentage of Universal's net billings.

Paragraph 14(c) of the Distribution Agreement, in turn, defines "net billings" as "[Universal's]

wholesale price for sales hereunder of RMM product invoiced during each billing month, less

returns and credits.

The parties dispute regarding the distribution fee does not focus on the mathematical

computation.  Rather, it concerns the interpretation of what types of items can be deducted from

the amount of sales made, to arrive at the net billings figure.  Inasmuch as the distribution fee is

a percentage of the net billings amount, the more that is deducted from it, the lower the

distribution fee.

RMM argues that the definition of net billings includes a deduction for "credits" and that the term extends to all types of credits.  In the course of business, Universal entered into co-op advertising[9] arrangements with certain retailers.  Inasmuch as Universal issued credits against the accounts of these retailers for the co-op advertising services, RMM argues that the plain meaning of the term "credits" requires that the amounts expended for co-op advertising, labeled as credits, must be deducted from the total sales to determine the net billings.

Universal maintains that its distribution fee is based upon product actually shipped. Universal contends that the provisions at issue relate solely to the sale and return of product.  As such, Universal urges that the "credits" referenced are credits for returned product.  Universal maintains that co-op advertising relates to its effort to promote the product but has nothing directly to do with the sale and distribution of records.  Universal further argues that RMM's interpretation is illogical because by paying Universal a percentage of net sales, the Distribution Agreement is intended to provide an incentive for Universal to sell more of the product. Universal contends that if it had to fund advertising costs and deduct them from net sales before calculating its distribution fee, Universal would not seek to incur those advertising costs.  In addition, Universal notes that had it chosen to issue checks to the retailers for the co-op

---

[9]Co-op advertising or cooperative advertising is a cost-sharing arrangement between a manufacturer, supplier, wholesaler or distributor (collectively, the "Supplier") and a retailer in which the Supplier pays for part of the retail establishment's advertisement in exchange for the advertisement mentioning the Supplier's product or business.  *See The National Federation of Independent Business*, Feb. 20, 2006 available at http://www.nfib.com/object/IO_26898.html (last visited November 17, 2008).  Co-op advertising is "the joint promotion effort of two or more parties in the selling chain."  T.W. Hutchison, A. Macy & P. Allen, RECORD LABEL MARKETING, p.187 December 2005.  As most commonly used in the recording industry, record labels will form a co-op advertising program with retail chains.  *Id.*  Most album advertising involves the retailer generating co-op advertising to increase albums' sales, with the record company paying for it.  *Gordy Co. v. Mary Jane Girls, Inc.*, 1989 WL 149290 at *5 (S.D.N.Y. Dec. 6, 1989).

advertising, in lieu of affording them credit memos, there would be no question that the co-op

advertising payments would not be deducted from the amount of sales to arrive at the net billings

figure - a point conceded by RMM's expert.  Thus, Universal contends that the mere

happenstance that certain payments for co-op advertising were paid by crediting the retailer's

accounts, in the form of and labeled "credit" memos, should not impact the distribution fee.

Moreover, Universal maintains that RMM's interpretation of the import of the term credits in

section 14(c) conflicts with section 14(d) of the Distribution Agreement, which separates co-op

advertising costs and credits into distinct categories.

   The Distribution Agreement provides that it is governed by California law.  Pursuant to

California law, a contract's interpretation is a question of law.  *In re Bennett*, 298 F.3d 1059,

1064 (9th Cir. 2002).  The basic goal of contract interpretation is to give effect to the mutual

intention of the parties.  *Id*. *see also* Cal. Civ. Code §§ 1636, 1638.  The relevant intent,

however, is objective and must be ascertained from the writing alone.  *In re Bennett*, 298 F.3d

1059*; see also Centigram Argentina, S.A. v. Centigram Inc*, 60 F. Supp. 2d 1003, 1007 (N.D.

Cal. 1999).  The focus is on the terms used in the contract.  *Bennett*, 298 F.3d at 1059.

Nevertheless, contract provisions cannot be considered in a vacuum.  *Centigram*, 60 F. Supp. 2d

at 1011.  Rather, the entire contract must be interpreted together.  *Id*.  The contract is to be

viewed as a whole in order to give effect to every part, if reasonably practicable, with each

clause assisting in interpreting the other.  *Centigram*, 60 F. Supp. 2d at 1003.  A contract's

language governs its interpretation as long as the language is clear and explicit and would not

lead to an absurdity.  *Id*.  Before parol evidence can be admitted, a contract must be ambiguous

and susceptible of the proffered meaning. *Bennett*, 298 F.3d at 1059.  If there are two equally

23

plausible interpretations for the language used, parol evidence can be admitted to assist in interpreting the contract, resulting in a question of fact which precludes summary judgment if there is contradictory evidence. *Centigram*, 60 F. Supp. 2d at 1003.

Here, viewing the contract as a whole, the Court concludes that the credits to be deducted from the sales figure to arrive at the calculation for net billings are credits associated with the distribution of the product. Thus, the credits are those related to return of product, or to product that could no longer be considered as having been distributed. This interpretation is consistent with the context and purpose of the distribution fee provision. Universal is entitled to a percentage of the total sales volume of product that it distributes. Therefore, if any records are returned, that amount is deducted from the sales amount upon which it calculates its percentage fee.

Moreover, paragraph 14(d) lists returns and credits under a separate category from co-op advertising charges and both categories are to be deducted from total sales to calculate "net proceeds." If the use of "credits" in the definition of net billings in paragraph 14(c) were meant to encompass charges for co-op advertising, the additional reference to deducting co-op advertising charges to arrive at "net proceeds" in paragraph 14(d) would be superfluous. Otherwise, one would have to deduct the co-op charges twice to arrive at the amount for net proceeds.

Pursuant to paragraph 12(a) of the Distribution Agreement,[10] RMM represented that it was responsible for any advertising costs related to RMM product. In accordance with this,

---

[10]Section 12(a) of the Distribution Agreement provides, in relevant part, that
> RMM warrants and represents . . . [that] RMM will be responsible for and will perform all functions of a major record company . . . including. . . the marketing , promotion and advertising of RMM product.

paragraph 14(d) of the Distribution Agreement provides that any monies expended for co-op advertising would be deducted from the wholesale price for sales of RMM product prior to arriving at the net proceeds to be paid to RMM pursuant to paragraph 6 of the Distribution Agreement. If the co-op advertising payments were deducted prior to calculating the distribution fee, then Universal would have less incentive to incur the cost. As Universal asserted, it would not fund the co-op advertising by taking it out of its distribution fee.

Further, regardless of the form taken, advertising payments do not directly impact a distribution calculation. If the intent of the parties had been to deduct anything that was labeled credits regardless of whether it directly impacted the computation of the product distributed, Universal could have easily circumvented the provision by merely paying for the item through another medium. As it proffered, it could have issued checks to the retailer for the advertising charges instead of issuing "credit memos."

Moreover, although co-op advertising could increase the number of records sold thereby increasing Universal's distribution fee, the contract relegated the cost of advertising to RMM. Had there been an intent to allocate some portion of the advertising costs to Universal, the parties would have expressly provided for it, or at least not hidden it in a provision that easily could be circumvented.

Thus, considering the contract as a whole and interpreting its provisions by giving effect to every part, the contract is unambiguous and can be interpreted as a matter of law. The Court concludes that, based upon the contract as a whole, credit memos for co-op advertising are not the type of credits that were intended to be deducted from sales to calculate net billings.

RMM claimed that Univeral had exceeded its contractual distribution fee by $203,604.

25

Universal did not contest RMM's conclusion with respect to $127,398 of that amount.  Rather it contended that $76,206 of the total amount RMM sought was incorrect based upon its interpretation of the appropriate deductions to be taken from sales.

Therefore,  RMM's Incorrect Distribution Fee Claim is reduced by $76,206 and it is granted summary judgment for the balance of $127,398.

The Returns Liability Counterclaim

Universal moves for summary judgment in it favor on its Returns Liability Counterclaim.  As previously noted, the Stipulation provided that, subject to RMM's right to conduct an audit of the amount, there was a reduction from the Note of $584,180 for Returns Liability, i.e., amounts due Universal for the issuance of credits to customers by Universal for the customers' returns of records distributed to customers prior to the Closing Date but returned after the Closing Date.  Universal asserts that its calculation of the amount due for the Returns Liability was for the period through the first anniversary of the Closing Date.

Universal maintains that, after the Closing Date and continuing after its first anniversary, in accordance with its Returns Policy and Procedures, it applied credits to customer accounts who, after the Closing Date, returned RMM product that had been distributed prior to the Closing Date.  Universal argues that RMM has a continuing obligation to indemnify Universal for costs associated with those returns.  Universal asserts that it makes sense for Universal to receive a dollar for dollar reimbursement because RMM received the income from the sales but Universal had to pay the retailer for any returns.  Universal contends that, as of the date of its calculation, the minimum provable number, as a mathematical certainty, for the Returns Liability is $714,360.35.  The Note was previously reduced for Returns Liability in the amount of

26

$584,180, pursuant to the terms of the Stipulation.  Universal, therefore, argues that RMM owes the balance of $130,180.35 and moves for summary judgment as to that amount.

RMM opposes this relief.  RMM argues that the Returns Liability was limited to returns made within one year of the Closing Date.  RMM points to the fact that the APA limited its audit rights concerning Returns Liability for a one-year period from the Closing Date.  Therefore, RMM argues that its indemnification obligation is similarly limited.  In addition, RMM challenges the accuracy of the Returns Liability calculation contending that Universal has not adequately shown that the $584,180 in returns were actually of product that was distributed prior to the Closing Date.  As such, RMM seeks to reclaim the $584,180 that was previously deducted from the Note.  RMM asserts that Universal failed to re-sticker or otherwise tag the RMM product sold after the Closing Date, as required by the APA.[11]  RMM maintains that if Universal had complied with this obligation, tracing of sales would have been easier, as one could then distinguish whether the RMM product being returned had been sold prior to or after the Closing Date.  As a result, RMM contends that Universal must bear the burden of its failure.

Universal argues that there is no cutoff date in either the APA or the Stipulation with respect to Universal's entitlement to indemnification for the Returns Liability.  Universal asserts that the pursuant to the terms of the APA, it has an unqualified right to seek indemnification for the returns.  Universal further argues that the Stipulation did not restrict that right or make Universal responsible for further returns.  Thus, Universal maintains that it has a right to deduct from the Note amounts representing subsequent returns of pre-closing sales.

---

[11]Pursuant to Section 2(d)(G) of the APA, UMVD agreed to:
> use commercially reasonable efforts to 'resticker' or otherwise mark any inventory of Records acquired by Buyer hereunder in order to be able to distinguish between Records that were distributed prior to the Closing and Records that were distributed after the Closing.

As noted, Universal maintains that $714,360.35 is the minimum amount owing for Returns Liability.  Universal contends that the amount is likely larger but that it has used conservative approaches to calculate the amount.  For certain titles, it compared the number of units of RMM product sold by Universal after the Closing Date with the number of returns after that date and determined that any excess of returns must be attributable to sales made prior to the Closing Date.[12]  For titles with a very high volume of returns, instead of the aggregate data, a more detailed store-by-store analysis was utilized to better reveal returns attributable to product sold prior to the Closing Date.  Universal maintains that there was no duplication because each title was compared under only one of the approaches.  Universal asserts that the manner in which it has computed returns results in a calculation that is less that the amount to which it is actually entitled.  Consequently, Universal argues that its failure to re-sticker or tag the RMM product sold after the Closing Date does not adversely impact RMM because, although Universal did not identify each unit of a particular title that was shipped prior to the Closing Date, its calculation must reflect, "as a matter of pure mathematics," the minimum number of returns of items from sales made prior to the Closing Date.

At the Hearing, RMM conceded that the pure mathematical computation was correct but argued that Universal may have manipulated the number of returns of RMM product by flooding the market with RMM product.  RMM contends that the parties were cognizant of the opportunity for such manipulation and, therefore, in connection with RMM's obligation to indemnify Universal for any returns, included the following provision in Section 2(d)(G) of the

---

[12]Universal provides the following example:
  if 500 units were sold after closing, but 750 units were returned after closing, at least 250 of those
  returned units must have been sold prior to the closing.

28

APA

> In addition, Buyer shall not take any action in bad faith which is inconsistent with standard business practices in the U.S. recorded music industry and is intended solely to maximize the number of returns of Records that were distributed prior to closing.

Thus, RMM argues that there are issues of fact concerning whether Universal acted in "bad faith" to flood the relevant market with RMM product from August 2001 through March 2004 in an effort to increase the number of RMM returns after the Closing Date.

There is nothing in either the APA or the Stipulation that would limit Universal's entitlement under APA § 2(d)(i)(G) to indemnification pursuant to APA § 11(c) for the Returns Liability. Further, RMM received the income from those sales that occurred prior to the Closing Date and, therefore, it is consistent for it to be obligated to reimburse Universal for any returns of those products for which Universal paid by crediting the customer accounts.[13]

There are, however, factual issues concerning whether Universal's alleged flooding of the market with RMM product was "intended solely to maximize the number of returns of [RMM product] that were distributed prior to closing" and whether this violated the terms of Section 2(d)(G) of the APA, which prohibited Universal from "tak[ing] any action in bad faith which is inconsistent with standard business practices in the U.S. recorded music industry."

Therefore, with respect to the Returns Liability Counterclaim, the Court concludes that, pursuant to the APA, RMM has a continuing obligation to Universal for Returns Liability. However, because there is a factual issue concerning whether Universal attempted to increase the

---

[13]Universal adequately addresses RMM's contention that because RMM's right to audit Returns Liability was limited to the one-year period after the Closing Date, its indemnification obligation must be similarly limited. Universal asserts that the audit provision in the APA merely afforded RMM the right to conduct a full audit of Universal's books and records. The absence of full audit rights, however, would not preclude RMM from seeking back up documentation concerning any request by Universal for payment of Returns Liability.

number of returns of RMM product sold prior to the Closing Date, a trial is required, limited to the issue of whether Universal violated the "bad faith" provision of Section 2(d)(G) of the APA.

## Claim for "Credits Due for New Top-Line LP Releases"

Pursuant to an amendment to the Distribution Agreement, RMM was entitled to a $1,750 credit related to promotional expenses for each of the first 50 "New Top-Line LP Releases." RMM claims that 35 titles issued by Universal during the time period covered by the audit were "New Top-Line LP Releases" and, therefore, it seeks $61,250. Universal argues that none of the recordings qualify for that credit and it seeks dismissal of this claim. The parties dispute whether any of the recordings at issue qualify as the type of "New Top-Line Release" for which the entitlement applies. Moreover, it is not clear from the contract language exactly what criteria must be met to qualify as a "new Top-Line LP Release." Thus, there is a factual dispute precluding entry of summary judgment.

## Claim for "Unsubstantiated Costs Charged."

RMM asserts that costs charged to it in the amount of $342,848 are unsubstantiated and, therefore, Universal owes RMM that amount. RMM asserts that the reports proffered by Universal, in support of its claim, are inadequate because they are computer generated. In addition, while Universal was entitled to a distribution fee, RMM argues that Universal was not entitled to a profit mark-up with respect to product manufactured. Rather, RMM asserts, Universal was only permitted to pass along to RMM the costs of manufacture incurred by Universal. RMM argues that, with respect to a certain category of charges related to product manufactured at the Pinckneyville location, Universal has not provided invoices. RMM asserts that Universal has failed to provide this documentation because it improperly charged a profit

30

mark-up and the invoices will not correspond to the costs charged.

Universal asserts that it submitted detailed backup information for all of the costs that it has charged RMM and that the information is similar to that which it usually supplies to support claims for costs.  Universal asserts that it provided manufacturing receipt reports, perpetual inventory reports, or DJ promo fulfillment reports - all generated by Universal's inventory system, known as Legacy, which has a variety of internal controls to ensure the accuracy of all system data.  With respect to these reports, Universal further asserts that

> - it matches all purchase orders to the product it receives from the manufacturing facilities;
> - the perpetual inventory reports are used to reconcile inventory and track the flow of product units from one location to another;
> - it verifies the number and cost of any invoiced items before it makes a payment to the manufacturer; and
> - it utilizes these report in the ordinary course of its business to conduct its normal business functions, including the preparation of its financial statements.

Universal argues that RMM's demand for paper invoices is outside the mainstream of business practice in the industry because computerized records, routinely kept and relied on in ordinary course of business, are proper evidence of amounts due.  Further, Universal contends that RMM has not presented any basis to call into question the accuracy of the computerized business records and no justification for its blanket refusal to accept any computer-generated material. Moreover, Universal assets that RMM's auditor has not shown any instance of a paper invoice contradicting the computer data.  Universal urges that in the absence of identified error or methodological flaws in the accounting records, RMM's claim must be dismissed.

With respect to the Pinckneyville plant charges, Universal asserts that it was partial owner of the plant.  As such, Universal argues that the Distribution Agreement authorizes it to charge RMM a standard manufacturing charge, *i.e.*, a charge consistent with charges made by

31

other manufacturers in the industry.

RMM counters that the referenced provision would only authorize Universal to bill the standard manufacturing charge if Universal manufactured the product.  Otherwise, as in this case, RMM asserts that Universal can only pass along the charge that it incurred.  Universal contends that Universal's failure to comply with that requirement is the reason that it has steadfastly refused to produce the actual invoices it received from the Pinckneyville location.  As such, RMM argues that there is, at the least, an issue of fact as to this claim precluding summary judgment in favor of Universal.

If computer records are routinely kept and relied upon in the ordinary course of business, they can qualify for admission.  *In re Holstein, Mack & Klein*, 200 WL 343795 at *7 (Bankr. N.D. Ill. 2000).  Pursuant to Fed. R. Evid. 802(6), these records are admissible, as an exception to the hearsay rule, if testimony is offered by a person with knowledge of the manner in which these documents were generated or recorded.  Universal has proffered the declaration of its comptroller with knowledge of the manner in which the computer records were generated and recorded.

Apart from the argument concerning the Pinckneyville location, RMM has not shown any inaccuracy with respect to the computer-generated records and those records are admissible as business records kept in the ordinary course of business.  With respect to the Pinckneyville location, however, there is an issue of fact concerning whether Universal charged RMM the appropriate amount for the product that was manufactured at that location.  Further, even if the standard charges were to apply, there is an issue of fact as to what charges would be consistent in the industry.  Therefore, summary judgment is denied for that portion of the claim for

"Unsubstantiated Costs Charged" that represents charges associated with the Pinckneyville location, and summary judgment, in favor of Universal, is granted for the balance of the claim.

Claim for "Unsubstantiated Co-op Costs Charged"

The co-op advertising costs are payments that Universal makes to record stores in exchange for the record stores promotion of Universal's product.  Universal maintains that it typically compensates record stores and other customers for co-op advertising costs by issuing a credit to the customer's account.  Universal asserts that it supplied the RMM auditors with a copy of the actual credit memos it sent to record stores as payment for the advertising and promotional activities.

RMM asserts that Universal did not provide proper documentation for $50,078 of the asserted co-op advertising charges.  RMM argues that the information Universal provided is insufficient computer printouts.  Therefore, RMM asserts a claim for "Unsubstantiated Co-op Costs Charged" in the amount of $50,078.

Universal asserts that, even though computer printouts would be sufficient evidence, these records are not internal computer printouts.  Rather, Universal maintains that they are the very documents that Universal sent to record stores, and, based on these memos, Universal issued credits to the customer accounts.  Universal asserts that they are the functional equivalent of paper invoices.

As discussed in the previous section, these computer-generated records are admissible and RMM has not challenged their accuracy.  Thus, summary judgment is granted, in favor of Universal, dismissing the claim for "Unsubstantiated Co-op Costs."

Claim for "Excess Co-op Costs Charged."

33

Pursuant to the Distribution Agreement, Universal received pre-approval from RMM to spend up to 3% of net billings on co-op advertising of RMM product for each year of the agreement.[14]  RMM asserts a claim for "Excess Co-op Costs Charged" for $404,298, arguing that those charges exceed the 3% limit and Universal has not shown that it received further authorization from RMM for the additional charges.

Universal asserts that it obtained approval for amounts in excess of that 3% level and reflected such in its monthly accounting statements to RMM and that no one at RMM ever objected to the charges or made a claim that they were not pre-approved.

The parties disagree on whether Universal received authorization or approval from RMM for the co-op advertising costs exceeding 3% of the net billings.  Universal's argument concerning RMM's failure to challenge the monthly accounting statements is evidence to be weighed by the fact finder.  Thus, there is a factual issue precluding summary judgment

### Claim for "Incorrect Return Credits for CDs and Cassettes"

Universal deducted from its payment to RMM amounts that were returned to customers for damaged CDs and cassettes.  RMM objects to the charge because it alleges that the charge is an estimate rather than an actual accounting and, therefore, RMM asserts a claim for "Incorrect Return Credits for CDs and Cassettes" in the amount of $76,681.

Universal asserts that the calculation was not an estimate of the credit given to the

---

[14]Section 10 of the Distribution Agreement provides that

> RMM hereby pre-approves [Universal's] spending up to 3% of Net Billings on co-op advertising in connection with the sale of RMM Product hereunder during each year of the term of this agreement. [Universal] will administer such co-op advertising programs, and will provide RMM with appropriate "back-up" documentation with respect to such expenditures.  All co-op advertising monies spent by [Universal] and approved by RMM will be deducted from monies otherwise payable to RMM under this agreement.

customers but, rather, the actual amount credited to the customer.  Pursuant to its Returns Policy

and Procedures, it credits the retailer for defective goods based upon a percentage of gross

purchases because it would not be cost effective to require the customers to return damaged

product as Universal could not use or resell it.  RMM's auditor has acknowledged that other

record companies credit their customers for the return of damaged items in the same manner.

Further, Universal asserts that nothing in the Distribution Agreement precludes it from this

method of calculating the cost.

RMM's challenge to this cost in its audit report was that the charge is an estimate.  While

it is an estimate as concerns the relationship between Universal and its customer, it is not an

estimate as between Universal and RMM.  Rather, it is the actual amount that Universal credited

its customer for which RMM is accountable.  The Distribution Agreement does not preclude

Universal from crediting the customer accounts for defective product based upon a percentage of

gross sales and this method is set forth in Universal's Returns Policy and Procedures.  Moreover,

it is a method used in the recording industry because of the costs associated with handling

returns of merchandise.  Therefore, summary judgment is granted in favor of Universal and the

claim for "Incorrect Return Credits for CDs and Cassettes" is dismissed.

### The UMLA Claims

RMM has asserted several audit claims based on its audit of UMLA.  RMM alleges that

UMLA was required to credit RMM when it liquidated any reserves or benefitted from tax

credits in connection with the distribution of RMM product in foreign territories.

Universal argues that both claims are based on the mistaken assumption that UMLA

directly distributed products in foreign territories.  Universal asserts that UMLA's affiliates

distributed RMM product in foreign countries and, therefore, UMLA would not take reserves or benefit from tax credits in foreign countries to pass on to RMM.

RMM concedes that, if UMLA did not directly distribute RMM product in the foreign territories, UMLA would not have reserves to liquidate nor would it receive the benefit of foreign tax credits. Nevertheless, RMM, argues that there are issues of fact concerning whether reserves taken in connection with sales of RMM product in foreign territories under the authority of UMLA have been properly liquidated by such foreign licensee to UMLA, and if they were, if UMLA received its share of such liquidated reserves. RMM argues that because there is a provision in the UMLA Licensing Agreement referencing UMLA's right to take reserves, reserves must have some relevance to UMLA.

There is no dispute of fact that UMLA did take any reserves. Confronted by that fact, RMM speculates that a foreign UMLA affiliate may have withheld reserves and have subsequently liquidated such reserves and, ultimately, may or may not have shared a distributive share with UMLA. RMM has presented no facts to support its speculation. Nor has it sought to reopen discovery or in any way argue that it did not have sufficient time to develop its theory. Therefore, summary judgment on the UMLA claims in favor of Universal is properly granted and the UMLA claims are dismissed.

As noted, RMM moved for summary judgment to dismiss Universal's counterclaims. The Court has already addressed the Returns Liability Counterclaim in the section on Audit Claims. In addition, Universal concedes that the BMG Counterclaim was resolved in the Stipulation. Therefore the Court turns to RMM's request to dismiss the Celia Cruz Counterclaim and the Paternos and Castellanos Counterclaims.

36

The Celia Cruz Counterclaim

The catalog of master recordings and artist agreements transferred to Universal, pursuant

to the APA, was intended to provide Universal with the right to exploit and profit from such

recordings for years.  To that effect, with respect to the assets transferred, RMM represented and

warranted that (i) it had "good and indefeasible title to all of the Intellectual Properties [which

included the Master Recordings] free and clear of any liens, claims interests and other

Encumbrances other than those in favor of [Universal]," (ii) upon Closing, Universal would then

"hold good and indefeasible title to, and . . . exclusive ownership of[] all of the Assets, (iii)

"[RMM] own[ed] all Exploitation Rights [to the Master Recordings], and (iv) each recording

artist agreement included therein was in writing and then in effect.  APA, § 6(m),(n),(v)(v), and

(w).

Further, as previously noted, pursuant to Section 11(c)(i) of the APA, RMM agreed to

indemnify Universal for any Losses, which were defined to include any "reasonable fees and

expenses of investigation and counsel," that Universal sustained from "any misrepresentation or

any breach of the representations, warranties, covenants and agreements made or [that were]

deemed made by [RMM] in or in connection with [the APA]."[15]

On October 31, 2003, the Note's maturity date, Universal notified RMM, by letter (the

"October 31 Letter"), that Universal might be subject to damages because of "various breaches

by RMM of its representations and warranties under the [APA] . . . with respect to the Celia

Cruz Master."  In the proceeding in which RMM sought payment on the Note, Universal

_____

[15]In addition, Section 11(c)(i)(D) provided, in relevant part, that RMM would indemnify Universal for "
investigations [or] claims" that were incidental to any misrepresentations or breaches of representations or
warranties.

advanced its argument concerning RMM's alleged misrepresentations in the APA.  Specifically,

Universal contended that RMM misrepresented that it had good title and ownership rights to

Cruz's recordings, as well as a legal and binding written agreement with Cruz.  According to

Universal, after the APA's closing, the Cruz Estate notified it that Universal did not have rights

to Cruz's recordings in that it was unaware of any agreement that would allow Universal to sell

or license Cruz's recordings.

　　　　RMM responded, in the proceeding on the Note, by arguing that Univeral's claim

premised on the Cruz dispute was premature, noting that the Cruz Estate had not pursued any

claim against Universal.  RMM asserted that "[t]o RMM's knowledge, other than the exchange

of a few pieces of correspondence between Universal and the Estate of Celia Cruz in the summer

of 2003, the purported claim by [Cruz] has not been pursued, and Universal continues to have

and to exercise the unfettered right to commercially exploit the Celia Cruz master recordings

which were transferred by RMM to Universal pursuant to the APA."

　　　　In its June 7, 2007 Opinion, the Court found that the Cruz claim was too conclusory and

speculative to use as an offset or affirmative defense to payment on the Note.  *RMM Records &*

*Video Corp. v. Universal Music & Video Distribution Co., (In re RMM Records & Video Corp.)*

372 B.R. 603, 614 (Bankr. S.D.N.Y. 2007).  The Court noted that its analysis applied whether

the APA provision on indemnification was classified as one against loss or against liability

because there was no fixed liability or loss for an actual misrepresentation, nor was there even a

definitive claim by the Cruz Estate.  *Id*. at 615.  Thus, the Court concluded that Universal had

"not shown any damages, and its unsupported claim that the purported cloud on the title to

Cruz's recording damages Universal by restricting it ability to sell the Cruz recording is simple

conjecture." *Id.*

RMM has acknowledged that it has been unable to locate a written agreement with Cruz but contends that its representation that it transferred to Universal the ability to exploit the master recordings was valid.  The Celia Cruz master recordings had been exploited and distributed by RMM for years without objection by either Cruz or her estate.  Therefore, RMM contends that Universal has not made the requisite showing of damages to sustain the Celia Cruz Counterclaim.

Universal asserts that after it received the communication from the Cruz Estate, informing Universal that the Estate was unaware of any agreements with Ms. Cruz which would authorize Universal to exploit her recordings, Universal initiated an internal investigation to locate the recording agreements with Ms. Cruz.  Universal maintains that the investigation did not uncover any written agreements.  Rather, according to Universal, it appeared that RMM entered into various oral contracts with Ms. Cruz, some of which were memorialized in "handwritten notes scribbled on a notepad."  Universal contends that the absence of written agreements has seriously impaired Universal's ability to rebut the Cruz Estate's claims. Universal further asserts that the dispute with the Cruz Estate has yet to be resolved.  Universal maintains that, to date, the legal bills that it has incurred to investigate the Estate's claims total approximately $12,524.84.

Universal also argues that, because of the cloud over Universal's title, it has been unable to avail itself of numerous opportunities to exploit the Cruz recordings "out of fear of provoking a lawsuit."  In an effort to show purported damages, it gives two examples of offers to license the use of certain of the Cruz recordings for episodes of television programs, which opportunities

Universal claims that it was forced to forgo based upon its alleged fear of a lawsuit.[16]

RMM contends that the Celia Cruz counterclaim is non-actionable in that there has been no finding that RMM did not own good and indefeasible title to the recordings or that it breached the warranty of title and that, therefore, Universal has not suffered any damage.  RMM urges that any inquiries by the Cruz Estate are speculative and that "those five-year old inquiries simply do not constitute a 'cloud over Universal's title,' reasonable or otherwise."  RMM also notes that it manufactured and distributed the Cruz recordings more than seven years ago, prior to the sale to Universal in the 2001 APA, and that any claim by the Cruz estate would be barred by both the U.S. Copyright law's three-year statute of limitations and the years of acceptance by Cruz of royalty payments.  RMM also argues that the $12,524.84 sought for investigation of the claim is inflated and should be less than half that amount.

Universal references the letters from the Cruz Estate, which it started to receive more than five years ago, purporting to challenge RMM's ownership of the Cruz master recordings. However, the status of those claims are the same as they were when the Court issued its June 7, 2007 Opinion, inasmuch as there has still been no fixed liability concerning the allegations of the Cruz Estate or even any definitive claim by the Cruz Estate.  Therefore, that claim remains speculative.

Universal cites *Jeanneret v. Vichey*, 341 F.Supp. 80, 82-82 (S.D.N.Y. 1982), *overruled on other grounds*, 693 F.2d 259 (2d Cir. 1982) to argue that a cloud on the title is sufficient to make its breach of warranty of title claim actionable.  Moreover, Universal claims that it has sustained damages because that cloud on title has forced it to forgo licensing opportunities.

---

[16]The putative combined value of the two mentioned opportunities it claims that it was forced to relinquish was $25,000.

40

Without deciding whether a cloud on the title would be sufficient to assert a breach of warranty of title claim in this circuit, the allegations in the instant case are not the type of "substantial cloud" that would constitute a breach of warranty of title in any event. *Id*, 341 F.Supp. at 82-82.[17]  RMM represented that it had good title to and could exploit the Master Recordings and that it was transferring those rights to Universal.  RMM continues to maintain that those representations are accurate.  With respect to those representations, Universal's claim against RMM based upon its dispute with the Cruz Estate remains speculative, especially in light of the copyright laws and RMM's history of having exploited the recordings for years without objection from the artist and with the artist accepting royalty payments for such use.

Nevertheless, pursuant to the Section 11(c)(i)(A) & (D) of the APA, Universal is entitled to indemnification for any investigations made in connection with any misrepresentations made in the APA.  Universal indicates that RMM breached the APA by representing that it had a written agreement with Ms. Cruz when it did not.  While asserting that it had good title to the master recordings that it could exploit and which rights it could transfer, RMM acknowledges that it has not located a written agreement.  Universal alleges that, thus far, in its investigation with respect to the Cruz allegations, it has spent $12,524.84.  RMM disputes the calculation and asserts that it is likely less than half that amount.

The Court concludes that Universal is entitled to indemnification for its costs of investigation concerning RMM's representation that there was a written agreement concerning the Cruz master recordings.  If the parties cannot reach agreement on the amount spent in that

---

[17]Moreover, it does not appear that the parties contemplated that a cloud on title would be sufficient to trigger the indemnification provision.  Rather, if there were a challenge to the ownership rights of the assets, Section 11(e) of the APA, concerning third-party claims, provided that RMM would be afforded an opportunity to take over any such defense.

41

regard, the Court will address that issue at the trial.  Thus, once the amount Universal spent on

the investigation related to RMM's representation that there was a written agreement with Ms.

Cruz is established, that amount may be reduced from the Note.  The balance of the Cruz

Counterclaim is dismissed, without prejudice to Universal asserting a claim against RMM if any

further recoverable damages are incurred.

The Paterno and Castellanos Counterclaims

After the sale of its assets in the APA and the confirmation of its Plan, RMM believed

that it retained ownership of certain malpractice actions.  To that effect, it commenced the

Paterno Action and the Castellanos Action.  It was Universal's view, however, that all of RMM's

assets, including any potential malpractice claims, were transferred to Universal pursuant to the

APA.  Thereafter, this ownership dispute was brought before this Court which concluded that the

malpractice actions were included within the assets transferred to Universal pursuant to the APA.

Universal's Paterno and Castellanos Counterclaims assert that by pursuing these

malpractice actions and asserting control over them, RMM breached its representation in Section

6(n) of the APA that upon the Closing Date, Universal would have title to and sole ownership of

the actions.  As such, Universal asserts that it is entitled to indemnification under Section

11(c)(i) for that breach.  Universal contends that it is entitled to indemnification for the

attorneys' fees that it incurred in connection with the Paterno Action.  Universal also asserts that

it is entitled to the value received by RMM in connection with the Castellanos Action.

RMM maintains that Universal has no actionable damage to assert with respect to the two

malpractice actions even if they were improperly pursued by RMM.  RMM argues that Universal

is not entitled to the attorney fees sought in connection with the parties' dispute that arose in the

42

context of the Paterno Action, which third-party action did not assert any claim inconsistent with

RMM's warranties.  While the dispute was brought up in the context of that action, the dispute

was actually one concerning the interpretation of the parties' agreement - the APA.  RMM

argues that attorney-fee indemnification provisions generally apply only to fees incurred with

respect to third-party disputes.  RMM contends that for an attorney-fee indemnification

provision to apply to any attorney's fees incurred by contracting parties for a dispute arising out

of that very contract, there must be an express provision to that effect, otherwise each party to a

contract is responsible for its own attorney's fees.  With respect to the claim stemming from the

Castellanos Action, RMM argues that Universal is not entitled to the benefit received by RMM

in that action because its resolution merely effected a settlement of a pre-petition claim filed

against the RMM bankruptcy estate by the Castellanos claimants.  The Castellanos claimants had

filed a pre-petition unsecured claim for $80,000 against RMM's estate and in settlement of the

Castellanos Action, that unsecured claim was reduced by $38,000 to $42,000.

Universal asserts that it incurred attorneys' fees in the Paterno Action because RMM

served a third-party subpoena against it requiring it to collect responsive documents.  In addition,

Universal argues that it incurred attorneys' fees when it was forced to intervene in the Paterno

Action after RMM continued to exert control over that action despite the Paterno defendants'

argument that RMM lacked standing to pursue the action.  Universal maintains that the pressure

to intervene resulted from its concern that the action might set a precedent that could impact

Universal's ownership of other assets acquired in the APA.  Universal also argues that its

intervention was prompted in a third-party dispute - the Paterno Action.  Universal also argues

that, with respect to the Castellanos Action, even though the settlement was effected through the

43

reduction of a pre-petition claim filed against RMM's bankruptcy estate, there was a benefit to the estate equal to the reduction of the pre-petition claim. Universal asserts that because the claim against the bankruptcy estate was reduced by $38,000, RMM benefitted by $38,000. Universal argues that because it owned the Castellanos Action, it is entitled to the value of that benefit.

Pursuant to the general rule, each party to a litigation is responsible for its own attorney's fees and the prevailing party is not entitled to reimbursement for such fees from the losing party unless authorized by the parties' agreement, a statute or a court rule. *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989); *Bourne Co. v. MPL Communications, Inc.*, 751 F2d 55, 57 (S.D.N.Y. 1990). As noted, the parties can agree to include a provision providing for such indemnification. However, in providing for such relief, the parties must carefully delineate the scope of such provision because a contractual indemnification provision is "strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Hooper*, 74 N.Y.2d at 491. Courts are reluctant to find waiver of the benefit of the general rule that each litigant is responsible for its own costs "unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." *Hooper*, 74 N.Y.2d at 491-92. Indeed, because such provision goes against the general rule, it is not found unless "the intention to do so is unmistakably clear from the language" that is used. *Id*. at 492. Moreover, where the subjects of an indemnification provision are not "exclusively or unequivocally referable to claims between the parties themselves," the provision would not support an inference that one party to such contract agreed to indemnify the other for attorney's fees it incurred in a suit between the parties concerning the contract.

44

*Hooper*, 74 N.Y.2d at 58; *Bourne*, 751 F2d at 492.

Here, RMM represented, among other things, that it owned and had good title to all the assets being sold and, consequently that Universal would acquire the same. Therefore, the indemnification provision would be triggered if any third-party asserted a claim disputing ownership or title of anything acquired by Universal pursuant to the APA. The "subjects" of the indemnification provision were the representations and warranties made by RMM. Thus, as in *Hooper* and *Bourne*, because third-party claims could be brought concerning the representations and warranties, those subjects are not "exclusively or unequivocally referable to claims between the parties themselves." Therefore, the indemnification provision does not support an inference that RMM agreed to indemnify Universal for attorney's fees it incurred in a dispute between RMM and Universal on the contract. The provision for indemnification in the APA was typical of those included in contracts to indemnify for third-party lawsuits.[18] There is no unmistakably clear language in the APA showing an intent to provide indemnification for attorney's fees in suits between the parties to the APA. Nor does the language and purpose of the entire agreement or the surrounding facts and circumstances support such an implication. The Court concludes that the indemnification provision in the APA does not call for indemnification of attorney's fees in disputes between the parties to the APA concerning its interpretation.

Universal argues, nevertheless, that the indemnification provision applies under the facts here because the dispute arose in the context of the Paterno Action, which was a third-party action as it was not a suit between RMM and Universal.

---

[18]The Court also agrees that the inclusion of a separate provision in Section 11(e), which concerns notice and settlement of third-party claims, does not impact the absence of language making clear whether indemnification was to be provided in suits between the contracting parties regarding interpretation of the APA. Nor would Section 11(e) be superfluous as it merely provides processes to be followed in noticing and settling third-party claims.

While the dispute concerning ownership of the Paterno Action was originally brought forth in the context of the third-party Paterno Action, it was actually a dispute between RMM and Universal concerning the interpretation of what assets were sold pursuant to the APA - an agreement between RMM and Universal.[19]  Indeed, the dispute was referred to the Bankruptcy Court for resolution of the interpretation of the APA.  As it was a dispute stemming from an interpretation of an agreement between the contracting parties, Universal would only be entitled to attorney's fees if the agreement specifically provided for them in that context.  The Court has concluded that the APA does not provide for indemnification under those circumstances.[20]

Although the Paterno Action was an asset that was transferred to Universal pursuant to the APA, and RMM exerted control over that property by pursuing the action, Universal has not shown any actionable damages.  RMM settled the action which resulted in its dismissal and no recovery to RMM.  Moreover, Universal did not seek to pursue the Paterno Action, nor has it argued that the asset itself had any intrinsic value for which it seeks damages.[21]  Rather, it only seeks damages for the attorney's fees expended in litigating its dispute with RMM.  As the Court has concluded that Universal is not entitled to reimbursement of its attorney's fees in that

---

[19]Moreover, there were no claims by the third-party in the Paterno Action inconsistent with RMM's representations in the APA.  To the contrary, the Paterno parties sought to uphold those representations and dismiss the Paterno Action, arguing that based upon RMM's representations in the APA, RMM transferred all assets, including the malpractice actions, to Universal.

[20]Nor is Universal entitled to indemnification for its costs associated in collecting responsive documents for the third-party subpoena served upon it in connection with the Paterno Action.  The underlying claims in the Paterno Action were for malpractice and unrelated to RMM's representations and warranties in the APA.

[21]While Universal filed a brief, dated December 14, 2004, in the Paterno Action as a joinder in support of the Paterno defendants motion to dismiss that action, Universal makes clear that the filing was done solely to protect its rights under the APA.  Universal's concern was that a determination in that action would set a precedent as to the scope of the assets transferred under the APA.  Universal apparently had no interest in pursuing the Paterno Action as shown by its statement that it was "forced to intervene as a necessary party" to protect its rights under the APA and that it did "not wish to become embroiled in the dispute between [RMM and the Paterno defendants]."

46

context, the Paterno Counterclaim is properly dismissed.[22]

With respect to the Castellanos Counterclaim, RMM again argues that Universal has not suffered any actionable damage from RMM having pursued the Castellanos Action. RMM asserts that, even if RMM exercised control over an action belonging to Universal, the settlement in that action only concerned a pre-petition claim to which Universal had no claim or interest. As such, RMM contends that the reduction of Castellanos's unsecured pre-petition claim is not actionable damage to Universal.

Universal counters that RMM received an economic benefit by exercising control over and pursuing the Castellanos Action, which action was an asset that was transferred to Universal under the APA. Universal contends that because RMM breached certain APA representations by controlling Universal's malpractice action against Castellanos, Universal is entitled to indemnification from RMM for the benefit it received in the settlement of the Castellanos Action.

RMM exercised control over the Castellanos Action by pursuing it and entering into a stipulation, pursuant to which an $80,000 unsecured claim that Castellanos had asserted against RMM's bankruptcy estate for its attorney fees was reduced by $38,000 to $42,000, in exchange for dismissal of the Castellanos Action. Thus, RMM received value from the Castellanos Action in the form of a reduction of a claim asserted against it. As the Castellanos action was Universal's property, the $38,000 value received from the Castellanos Action rightfully belongs to Universal. The fact that RMM credited the $38,000 to an amount owed by RMM to

---

[22]As the Court has dismissed the Paterno Counterclaim, it does not reach the issue of RMM's alternative argument that Universal waived its right to pursue the Counterclaim by participating in and knowingly allowing RMM to continue the Paterno Action for several years without Universal taking action earlier despite opportunities to act.

Castellanos is irrelevant in the context of this case where RMM's bankruptcy Plan paid 100

cents on the dollar.  Without the recovery from the Castellanos Action, and absent any other

available reductions, RMM would have had to pay Castellanos $80,000 on its pre-petition

unsecured claim.  Thus RMM benefitted from the Castellanos Action in the amount of $38,000.

RMM also argues that Universal waived or is equitably estopped from asserting the

Castellanos Counterclaim because Universal knew that RMM was prosecuting the Castellanos

Action but Universal failed to act earlier despite having opportunities to object to that course of

action.  Therefore, RMM asserts that Universal acquiesced in RMM's pursuit of the Castellanos

Action.

Unlike the Paterno Action, Universal does not allege that Universal participated in the

Castellanos Action.  The only allegation concerning waiver and equitable estoppel is that

Universal knew that RMM was pursuing the Castellanos Action and failed to address it even

with opportunities to object.  It is unclear whether Universal's silence in this regard was

intentional or inadvertent.  In any case, it would be inequitable for Universal to retain the benefit

of the value RMM received in pursuing the Castellanos Action without reimbursing RMM for

RMM's expense in that effort.  Therefore, the Court concludes that Universal is entitled to the

value received by RMM in pursuing the Castellanos Action after deducting the amount expended

by RMM in obtaining the benefit of the litigation.  If the parties cannot reach agreement on the

calculation, the Court will address the matter at the trial.

## CONCLUSION

Based upon the foregoing, the Court will admit Adler's testimony under Rule 701 as lay

testimony.  Further, even if the Court had not found Adler's testimony admissible as lay

48

testimony, the Court would have found Adler qualified to offer expert testimony.

The Court concludes that, based upon the contract as a whole, credit memos for co-op advertising are not the type of credits that were intended to be deducted from sales to calculate net billings. Therefore, because $76,206 of the total amount sought by RMM was based upon that deduction, the amount sought by RMM is reduced from $203,604 to $127,398. As Universal has not interposed an objection to the balance, RMM is granted summary judgment for its Incorrect Distribution Fee Claim in the amount of $127,398.

With respect to the Returns Liability, pursuant to the terms of the APA, RMM remains obligated to reimburse Universal for any RMM product sold prior to the Closing Date that was returned after the Closing Date. This reimbursement obligation, however, is subject to Universal not having taken "any action in bad faith which is inconsistent with standard business practices in the U.S. recorded music industry and is intended solely to maximize the number of returns of Records that were distributed prior to closing." Therefore, as the parties dispute whether Universal flooded the market with RMM product in violation of Section 2(d)(G) of the APA, summary judgment is denied for a trial limited to the issue of whether Universal violated this section of the APA.

With respect to the claim for "Unsubstantiated Costs Charged." summary judgment is denied for that portion of the claim that represents charges associated with the Pinckneyville location, however, summary judgment, in favor of Universal, is granted for the balance of the claim.

The claims for "Unsubstantiated Co-op Costs Charged" and "Incorrect Return Credits for CDs and Cassettes," as well as the UMLA Claims are properly dismissed and, therefore,

49

summary judgment is granted to Universal on those claims.

There are factual disputes precluding entry of summary judgment concerning the claims for "Credits Due for New Top-Line LP Releases" and the "Excess Co-op Costs Charged."

Universal is entitled to indemnification for its costs of investigation concerning RMM's representation that there was a written agreement with Ms. Cruz concerning the master recordings.  If the parties cannot reach agreement on the amount spent in that investigation, the Court will address that issue at the trial.  Once the amount Universal spent on the investigation is established, that amount may be reduced from the Note.  The balance of the Cruz Counterclaim is dismissed, without prejudice to Universal asserting a claim against RMM if any further recoverable damages are incurred.

Universal is not entitled to reimbursement of the attorney's fees that it incurred in connection with the Paterno Action and the Paterno Counterclaim is properly dismissed. Universal is, however, entitled to the value received by RMM in pursuing the Castellanos Action after deducting the amount expended by RMM in obtaining the benefit of that litigation.  If the parties cannot reach agreement on the calculation, the Court will address the matter at the trial.

Finally, prior to conducting a trial on any of the issues or calculations that are left, the Court is directing the parties to mediation to attempt to resolve them.

The parties should consult to submit a consensual order, consistent with this opinion.

Dated: New York, New York
        November 17, 2008


                                    **s/Arthur J. Gonzalez**
                                    UNITED STATES BANKRUPTCY JUDGE

50